**PHILO SMITH & COMPANY, INC. and James E. Rutherford, Plaintiffs,**

v.

**USLIFE CORPORATION, Defendant.**

**No. 74 Civ. 1280 (CHT).**

United States District Court,
S. D. New York.

Sept. 24, 1976.

**1268**

Dewey, Ballantine, Bushby, Palmer & Wood, New York City, for plaintiffs; Russel H. Beatie, Jr., Brendan P. Bovaird, New York City, of counsel.

Ullman Van Ginkel P. C., Sullivan & Cromwell, New York City, for defendant; Joel M. Miller, Susan J. McCone, New York City, of counsel.

## OPINION

TENNEY, District Judge.

This is an action for the recovery of a finder's fee brought under this Court's diversity jurisdiction, 28 U.S.C. § 1332. In an earlier memorandum opinion, dated December 20, 1974, the Court sustained the complaint insofar as it supported recovery based on the doctrine of promissory estoppel but dismissed the plaintiffs' other claims, based on two written finder's fee agreements and on the theory of quantum meruit, as barred by the statute of frauds, New York General Obligations Law § 5-701(10), and by the parol evidence rule. Trial was had on the one remaining claim before a jury, and the defendant moved for a directed verdict at the close of the plaintiffs' case. For the reasons stated below, the defendant's motion is granted and judgment is entered in favor of the defendant.

## FACTS

The involvement of the plaintiffs with the subject matter of this action began in 1968 [1] when plaintiff James E. Rutherford ("Rutherford"), an individual with long experience in the insurance field, first began thinking about and working toward an eventual acquisition of All American Life & Financial Corporation ("All American"), a Chicago-based insurance company, by the defendant USLIFE Corporation ("USLIFE"), a larger insurance company which had begun an active acquisitions policy several years earlier. Rutherford was working at that time as a "finder," one who introduces target companies to acquiring companies. He was a personal friend of E. E. Ballard ("Ballard"), at that time chief executive officer of All American, and also knew Gordon Crosby ("Crosby"), chief executive officer of USLIFE.

In the Spring of 1971, plaintiff Philo Smith & Co. ("PSCO"), through the head of

---

[1] In deciding the motion for a directed verdict, the Court must consider the evidence in the light most favorable to the plaintiff, "making due allowance for all reasonably possible inferences" favoring the plaintiff. *Galloway v. United States,* 319 U.S. 372, 395, 63 S.Ct. 1077, 1089, 87 L.Ed. 1458 (1943). The credibility of the witnesses is not to be weighed. *Simblest v. Maynard,* 427 F.2d 1, 4 (2d Cir. 1970). Thus, when the plaintiffs have put in some evidence in support of their position, the Court has assumed, for the purpose of deciding this motion, the correctness of the plaintiffs' position.

its finding department, Rodney Hawes ("Hawes"), approached All American with an offer of assistance in finding a company which might acquire All American or which All American might acquire. On June 8, 1971 Hawes called Crosby, stated that he knew Ballard and said that he could arrange a meeting between Ballard and Crosby. Crosby asked Hawes to get a letter from Ballard stating that a meeting could be arranged. When Hawes asked about a fee, Crosby said that that could be arranged if Hawes got the letter. Hawes had learned of Rutherford's history of involvement with Ballard and Crosby and met with him to ask him to request the letter from Ballard. Hawes, on the part of PSCO, and Rutherford agreed that they would be partners in any fee paid on the All American acquisition.

On July 8, 1971, Hawes met with Crosby at the USLIFE offices in New York. Hawes gave Crosby the requested letter from Ballard. Crosby asked Hawes to set up the meeting with Ballard, and Hawes agreed to do so. They then discussed possible fee arrangements. Hawes proposed the "Lehman" formula which Crosby rejected as resulting in too large a fee. Hawes then proposed a second formula which Crosby agreed to. Crosby called in his staff counsel, who prepared a draft of a fee agreement which stated that the agreement would terminate unless an agreement in principle looking toward an acquisition was made before December 31, 1971. Hawes objected, telling Crosby that it would be impossible to complete an agreement in principle by that time. Crosby then agreed to extend the termination date an additional six months to June 30, 1972. Hawes

stated that he was still concerned about the termination date, and Crosby responded, "If we're still interested in the acquisition at the time of the termination date, we'll be very happy to extend it." Crosby and Hawes then signed the agreement on behalf of USLIFE and PSCO respectively.[2]

The next day Hawes sent Rutherford a letter enclosing the fee agreement and agreeing to share equally with Rutherford any fee which PSCO would receive from USLIFE under the agreement. Thereafter, Hawes and Rutherford arranged a meeting between Crosby and Ballard which took place in Chicago on September 3, 1971. Jack Gardiner ("Gardiner"), who became President of All American in February of 1972, also attended a part of that meeting. At a meeting in Chicago on September 23, 1971, Crosby, accompanied by another officer of USLIFE and an officer of First Boston Corporation, advisors to USLIFE made an acquisition offer to Ballard, which Ballard rejected categorically. Following his return to New York, Crosby told Hawes that the offer had been rejected. Hawes suggested that Crosby should have met with Gardiner instead of Ballard, and that perhaps Hawes should now meet with Gardiner. Crosby agreed, and Hawes flew to Chicago and met with Gardiner on October 1, 1971. During that meeting Gardiner agreed to meet with Crosby and did actually meet with him in Chicago on October 5. Later in the same month Hawes assisted Crosby in setting up another meeting with Gardiner. Following that meeting, Hawes took no part in arranging meetings between USLIFE and All American and performed no further acts in aid of the transaction. At that time, the written fee agreement

2. The text of the first agreement read as follows:

"To confirm my discussion with Mr. Hawes, who has brought to our attention All American Life & Financial Corporation, we understand that your 'finder's fee' in the event we acquire said company would be 5% of the first million dollars of value given, 1% on the second through the fiftieth million of value given, and ½% on value given above $50 million. We are agreeable to such an arrangement provided that in no case would we pay more than 1% of total value given, and no payment shall be made unless the acquisition is consummated.

Our commitment under this letter shall expire if we and All American Life and Financial Corporation do not enter into an agreement in Principle looking towards an acquisition of said company by June 30, 1972.

If the foregoing is agreeable to you, please so indicate by signing and returning the enclosed copy of this letter."

had approximately eight months to run. Hawes continued to meet with Gardiner, however, discussing other companies which might acquire All American and which All American might itself acquire. One such acquisition by All American was announced in December of 1971 and finally consummated in April of 1973. PSCO received a fee of approximately $275,000 for acting as finder on that transaction.

In June of 1972 the first fee agreement was about to expire. Crosby and Hawes met at the beginning of that month. Crosby told Hawes that he still had an interest in acquiring All American. Subsequently, Crosby sent Hawes a copy of a new fee agreement which included Rutherford as a partner with PSCO, extended the expiration date to December 31, 1972, and gave USLIFE the option of paying the fee in stock or in cash. After discussing the new agreement with Rutherford, Hawes called Crosby and objected to the new payment option and to the shortness of the extension of the termination date. Crosby agreed to reconsider the payment situation but stated, as he had the year before, that the termination date would be reexamined at the end of the agreement and extended if USLIFE still had an interest in acquiring All American. Crosby sent a revised agreement to Hawes which stated that PSCO and Rutherford would be paid in cash but which retained the December 31, 1972, termination date. Hawes and Rutherford signed this agreement.[3] Hawes subsequently told Rutherford about Crosby's oral promise to review the termination date at the end of the agreement.

Hawes left his job with PSCO in September of 1972 but had an agreement with PSCO to continue to be involved with the All American/USLIFE transaction. Hawes met with Crosby on October 24, 1972. After discussing the possibilities of an All American/USLIFE transaction being consummated before the end of 1972, Hawes suggested that the fee agreement be extended. Crosby replied, "We'll take care of the paper work if we get anything going after the first of the year." Three days later Crosby met with Philo Smith of PSCO and stated that he was disenchanted with the performance of Hawes and that he had no intention of entering into another agreement with PSCO after the current one expired on December 31, 1972.

During the period of the two fee agreements, and, indeed, continuously throughout the period from 1968 until 1974, Rutherford was working to bring about an acquisition of All American by USLIFE, particularly in his regular meetings with Ballard. Over the Memorial Day weekend, 1973, some five months after the fee agreement had expired and at a time when Crosby,

---

3. The second fee agreement read as follows (signatures deleted):

"Agreement, dated June 26, 1972, among USLIFE Corporation ('First Party'), Philo Smith & Co., Inc. ('Second Party') and James Rutherford ('Third Party').
WITNESSETH
In view of the covenants and representations herein contained, the Parties agree as follows:
1. If First Party shall acquire All American Life and Financial Corporation, it shall pay to Second Party and Third Party collectively a cash sum equal to (i) 5% of the first million dollars of value given, (ii) 1% on the second through the fiftieth million of value given plus (iii) ½% on value given above $50,000,000; but in no event shall First Party pay more than 1% of total value given. 'Value given' shall mean the fair market value of the consideration actually paid by First Party on the day the acquisition is consummated.

2. The payment herein set forth is the sole payment in respect of the transaction that First Party shall make to Second and Third Parties collectively. Second and Third Parties shall make their own arrangement as to the division of such payment between them, as to which First Party shall not be a party; and Second Party and Third Party shall individually hold First Party harmless against claims made by the other which exceed First Party's obligation hereunder. Second and Third Parties shall give First Party a copy, executed by both, of such arrangement.

3. First Party's obligation hereunder shall expire if it and All American Life and Financial Corporation do not enter into an agreement in principle on or prior to December 31, 1972 looking towards the acquisition of said corporation.

4. This Fee Agreement is in part an extension of First Party's agreement with Second Party dated July 8, 1971."

despite an interest in acquiring All American, thought the acquisition could not be accomplished, Gardiner's office called Crosby at his vacation home and asked for a meeting. Crosby then called Rutherford and told him that he thought he had a proposal that All American would buy and that he wanted Rutherford to set up a meeting with Ballard. Rutherford agreed to do so, but told Crosby that the fee letter should be brought up to date. Crosby responded, "No problem, no problem."

On June 18, 1973, USLIFE and All American entered into an agreement in principle for the acquisition. That agreement was withdrawn by USLIFE on August 10, 1973, and another proposal was made which was rejected by the All American board of directors on August 15. A second agreement in principle was entered into on October 15, 1973, and the acquisition was consummated under the terms of that agreement on February 25, 1974. Throughout this period Rutherford was actively working for the acquisition, talking with shareholders, directors and investment bankers.

## STATUTE OF FRAUDS AND PAROL EVIDENCE RULE

■■■ As this Court made clear in its earlier opinion, the plaintiffs' claim for recovery of a finder's fee in this case must confront and overcome the serious obstacles posed by two basic legal doctrines: the statute of frauds and the parol evidence rule.[4] Section 5–701(10) of the New York General Obligations Law was amended in 1964 to make it absolutely clear that all contracts to pay compensation for the services rendered by a finder were void unless in a signed writing. See Minichiello v. Royal Business Funds Corp., 18 N.Y.2d 521, 277 N.Y.S.2d 268, 223 N.E.2d 793 (1966). The New York Court of Appeals has stated that the statute serves the policy of protecting "the principals in the sale of a business from . . . a claim for a . . . finder's fee not supported by the written

evidence." Intercontinental Planning, Ltd. v. Daystrom, Inc., 24 N.Y.2d 372, 383, 300 N.Y.S.2d 817, 826, 248 N.E.2d 576, 582 (1969). To allow the statute to be avoided easily would be to open the door "wide to possible frauds—the very thing which the statute was designed to prevent." Bright Radio Laboratories v. Coastal Commercial Corp., 4 A.D.2d 491, 494, 166 N.Y.S.2d 906, 909 (1st Dep't 1957), aff'd, 4 N.Y.2d 1021, 177 N.Y.S.2d 526, 152 N.E.2d 543 (1958). The impact of the statute of frauds on this case is strengthened by the effect of the parol evidence rule. The parties to this action executed two integrated written agreements, whose terms are not to be varied by oral agreements. See, e. g., Intercontinental Planning, Ltd. v. Daystrom, Inc., supra, 24 N.Y.2d at 378–79, 300 N.Y. S.2d at 822–23, 248 N.E.2d at 580; Tramco Industries, Inc. v. Broad Hollow Assoc., 23 N.Y.2d 841, 297 N.Y.S.2d 739, 245 N.E.2d 408 (1969).

## PROMISSORY ESTOPPEL

■■■ In its earlier opinion, this Court indicated that the plaintiffs had to establish the presence of the elements of promissory or equitable estoppel if they were to avoid the combined effect of the statute of frauds and the parol evidence rule. The most basic of these elements is that an oral promise must be made contemporaneously with or subsequent to the making of a written agreement. See M. H. Metal Products Corp. v. April, 251 N.Y. 146, 149, 167 N.E. 201, 202 (1929). For the purposes of ruling on this motion, the Court must assume that the defendant made four promises at the time of or subsequent to the execution of the first of the two written fee agreements, as described above. Thus, in order to establish their right to recover the finder's fee, the plaintiffs were required to show that all of the remaining elements of promissory estoppel were present with respect to at least one of these promises. First, they had to offer evidence that the promise was fraudulently made. Bulkley v. Shaw, 289

---

4. In this diversity action, the Court must apply state substantive law. Erie R. R. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

The applicability of New York state law to this case has not been questioned.

N.Y. 133, 139, 44 N.E.2d 398, 401 (1942); Sawyer v. Sickinger, 47 A.D.2d 291, 296, 366 N.Y.S.2d 435, 440 (1st Dep't 1975); Wagner v. Manufacturers' Trust Co., 237 App.Div. 175, 178, 261 N.Y.S. 136, 140 (1st Dep't 1932), aff'd, 261 N.Y. 699, 185 N.E. 799 (1932). Second, the defendant must have anticipated that the plaintiffs would rely on the oral promise and such reliance must have been reasonable on the plaintiffs' part. See Triple Cities Construction Co. v. Maryland Casualty Co., 4 N.Y.2d 443, 448, 176 N.Y.S.2d 292, 295–96, 151 N.E.2d 856, 858 (1958). Third, the plaintiffs must have relied on that oral promise by engaging in acts which are "unequivocally referable" to the oral promise. Burns v. McCormick, 233 N.Y. 230, 232, 135 N.E. 273 (1922); Bright Radio Laboratories v. Coastal Commercial Corp., supra, 4 A.D.2d at 494, 166 N.Y.S.2d at 909–10. Fourth, the plaintiffs must have suffered substantial injury as a result of engaging in those acts of reliance. M. H. Metal Products Corp. v. April, supra, 251 N.Y. at 150, 167 N.E. at 202; see Triple Cities Construction Co. v. Maryland Casualty Co., 4 N.Y.2d at 448, 176 N.Y.S.2d at 295–96, 151 N.E.2d at 858.

Looking at the evidence in the light most favorable to the plaintiffs, as it is again constrained to do, the Court concludes that the plaintiffs have not produced evidence showing that all of these elements were satisfied with respect to any single promise. Indeed, the plaintiffs have completely failed to demonstrate any injury resulting from acts of reliance or that any acts of reliance were "unequivocally referable" to any oral promises.

*Fraud*

The oral promises must be analyzed separately with respect to the element of fraud. Crosby's first oral promise, made contemporaneously with the making of the first written fee agreement, was "[i]f [USLIFE] is still interested [in acquiring All American] at that time [June 30, 1972], we'll be very happy to extend it." The substance of the second oral promise, made contemporaneously with the second fee agreement, was the same. Under the law of New York, one who seeks to show that a statement was fraudulently made must demonstrate, at a minimum, that the maker of the statement represented facts of which he had no actual knowledge or stated a present intention when he in fact had formulated no intention one way or the other. See Channel Master Corp. v. Aluminum Limited Sales, Inc., 4 N.Y.2d 403, 407–08, 176 N.Y.S.2d 259, 262, 151 N.E.2d 833, 835–36 (1958); Ultramares v. Touche, 255 N.Y. 170, 179, 174 N.E. 441, 444 (1931). In the present case, the plaintiffs have failed to produce any evidence of Crosby's intention concerning the substance of his oral promises of July 1971 and June 1972 at the time he made those promises. At both times he stated only that he would renew the agreements *if* USLIFE was still interested in the acquisition. In no way did Crosby promise to renew the agreements. At best, he promised only to reexamine the status of the defendant's acquisition plans at the expiration of each agreement and to extend the agreements if USLIFE were still interested. At trial, plaintiffs asked Crosby if he intended *to renew* the fee agreements when he made the oral promises; Crosby stated that he had formed no such intention one way or the other. Such a mental state, however, was perfectly consistent with Crosby's promise *to reexamine* the status of the relationship at the end of the agreements. Because of the nature of Crosby's promise, plaintiffs were required to produce evidence that at the time the promises were made Crosby either intended *not to reexamine* the status of the transaction or that he had formed *no* intention one way or the other on reexamining the status. The absence of any such evidence with respect to these two promises is fatal to the claim of plaintiff PSCO since, as will be discussed below, it is only on the July 1971 promise that PSCO could be said to have relied.

With respect to the promise in October 1972 which Crosby made to Hawes, the Court must assume that the plaintiffs' evidence shows that it was then Crosby's intention not to renew the second agreement. In a meeting with Philo Smith only three

days after the promise to Hawes, Crosby stated that he had no intention to renew the agreement. Hawes, however, testified that he did nothing in reliance on the October 1972 promise. Thus, any fraud with respect to that promise was without significance.

Finally, the Court must assume that Crosby promised some type of extension to Rutherford on May 30, 1973, five months after the expiration of the second fee agreement, when he replied "No problem, no problem" to Rutherford's query about updating the agreement. No evidence was produced revealing Crosby's state of mind at that time, however. Moreover, if it is assumed further that Crosby still intended not to reopen the fee agreement in May of 1973 as he had in October of the previous year, plaintiffs were unable to show that Rutherford's acts were "unequivocally referable" to Crosby's May 30 promise or that any acts of reliance resulted in injury to either Rutherford or PSCO.

*"Unequivocally referable" acts of reliance*

■■■■ As stated above and in this Court's earlier opinion, the plaintiffs must show that their acts of reliance upon the oral promise(s) were "unequivocally referable" to such promise(s). Such a doctrine is particularly important in a statute of frauds case where the plaintiffs attempt to avoid the unambiguous terms of a written agreement. The situation here is very similar to that in *Bakhshandeh v. American Cyanamid Co.*, 8 A.D.2d 35, 185 N.Y.S.2d 635 (1st Dep't 1959), where the plaintiff attempted to show that the fixed termination date of a written agreement within the statute of frauds had been extended by an oral agreement. The court rejected that claim, finding that the plaintiff's actions were not "unequivocally referable" to the oral agreement:

"[W]hat plaintiff claims to have done under the oral agreement could very well have been done in his own self-interest in

the performance of the original [written] contract." *Id.* at 38, 185 N.Y.S.2d at 638. The court's reasoning in *Bakhshandeh* is applicable to the actions of PSCO and Hawes in the instant case. As summarized in the statement of facts above, PSCO performed all its acts during the time periods of the two written agreements; indeed, virtually all of the actions were taken during the first four months of the first agreement. Thus, plaintiff PSCO's acts of reliance on the oral promises of July 1971 and June 1972 can, at best, be described only as *equivocally* referable to those promises. Moreover, the policies of the statute of frauds and the parol evidence rule virtually compel that any actions taken during the terms of the written agreements be found to refer to those agreements alone. To allow the plaintiffs to maintain that they were relying solely on an oral promise when they had executed a legally required and internally complete written agreement would eviscerate both the statute of frauds and the parol evidence rule.

■■■■ Plaintiff Rutherford, however, performed acts in 1973 following the termination of the second written agreement. While it is conceivable that these acts be found "referable" to one or more of Crosby's oral promises, particularly that of May 30, 1973, there is an equal likelihood that they referred to either of two additional situations. First, Rutherford was a substantial shareholder in All American and stood to profit from an acquisition of that company by USLIFE. Second, Rutherford testified that he was unconcerned about the termination date since, in a previous acquisition by USLIFE in which he had served as finder, Crosby had voluntarily extended the written agreement when the deal was not appropriately consummated before the expiration of the original agreement. Since Rutherford's acts could be said to have been equally in reliance on any of the three situations, the Court finds that they were not "unequivocally referable" to the oral agreement.[5]

---

5. The standard applied here was stated in *Simblest v. Maynard,* 427 F.2d 1, 4 (2d Cir. 1970): "Simply stated, [the standard] is whether the evidence is such that . . . there can be but one conclusion as to the verdict that rea-

sonable men could have reached." A conclusion that Rutherford's acts were "unequivocally referable" to Crosby's oral promise would be completely unreasonable.

1274

*Substantial Injury*

New York courts have long held that the statute of frauds cannot be used as an "instrument of fraud." Thus, where a party has been led to perform acts in reliance upon an oral promise otherwise within the statute and would suffer considerable injury if those acts were allowed to stand without the opposite party being forced to make good its oral promise, the application of the statute is said to work a fraud upon that party. As the Court of Appeals stated in *Woolley v. Stewart,* 222 N.Y. 347, 351, 118 N.E. 847, 848 (1918), a party can lose the right to set up the statute of frauds as a defense by

> "inducing or permitting without remonstrance another party to the agreement to do acts, pursuant to and in reliance upon the agreement, to such an extent and so substantial in quality as to irremediably alter his situation and make the interposition of the statute against performance a fraud."

In particular, the plaintiffs must show greater injury than that resulting from the mere failure of the defendants to perform the oral promise. Such a failure, standing alone, does not accomplish the required "fraud." *Bulkley v. Shaw, supra,* 289 N.Y. at 139, 44 N.E.2d at 401. Thus, the plaintiffs must show injury other than that resulting from USLIFE's refusal to pay a finder's fee.

The only acts performed by PSCO with regard to the All American/USLIFE transaction after the oral promise were the making of several phone calls and a trip to Chicago by Hawes. Even assuming these acts to have been performed in reliance on Crosby's oral promises (for the sake of this discussion only), they did not result in injury to PSCO. Indeed, the contacts between Gardiner and Hawes led eventually to the acquisition of another company by All American and thence to a substantial finder's fee for PSCO. Thus, the only substantial damage suffered by PSCO was US-LIFE's failure to pay a finder's fee on the All American transaction, and this damage is insufficient under New York law to avoid application of the statute of frauds.

Plaintiff Rutherford was more active on the All American/USLIFE transaction than PSCO, working toward the acquisition from 1968 until the time it was consummated in 1974. He was the only plaintiff to work on the transaction after the termination of the second fee agreement. Yet, Rutherford suffered no substantial injury as a result of these activities other than the loss of a fee. Many of his acts were meetings with Ballard, a personal friend with whom he lunched on a regular basis. Moreover, these activities eventually accrued to Rutherford's financial advantage because of his substantial stock interest in All American. Invocation of the statute of frauds under these circumstances does not work the kind of injury contemplated by New York law.

For the reasons stated above, the defendant's motion for a directed verdict is granted and judgment is entered for the defendant.

So ordered.