CHROMALLOY AMERICAN CORPORA-TION and Arrow Group Industries, Inc., Plaintiffs,

v.

UNIVERSAL HOUSING SYSTEMS OF AMERICA, INC. and Irwin Tobman, Defendants.

78 Civ. 395 (VLB).

United States District Court, S. D. New York.

July 15, 1980.

Whitman & Ransom, New York City, for plaintiffs, Chromalloy American Corp. and Arrow Group Industries, Inc.

Louis Strassberg, Strassberg & Strassberg, New York City, for defendants.

## MEMORANDUM ORDER

VINCENT L. BRODERICK, District Judge.

### I.

Plaintiffs Chromalloy American Corporation ("Chromalloy") and Arrow Group Industries ("Arrow") seek to recover from defendants Universal Housing Systems ("Universal") and Irwin Tobman on unpaid invoices and a promissory note. Defendants have counterclaimed for damages for breach of a joint venture agreement.

Plaintiffs have moved for summary judgment under Rule 56, Fed.R.Civ.P., 28 U.S.C.

For the reasons which follow, I find that the defendants have failed to establish the existence of any genuine issue of material fact as to all but one of plaintiffs' claims and as to all of the defendants' counterclaims. Summary judgment is granted to plaintiffs as to Counts I, III and IV of the complaint and as to all of the defendants' counterclaims. Summary judgment is denied as to Count II of the complaint.

### II.

The following facts are not in dispute:

Plaintiff Chromalloy is a Delaware corporation, engaged in manufacturing and shipping activities. Plaintiff Arrow, a wholly owned subsidiary of Chromalloy when this action was commenced,[1] is a New Jersey corporation engaged in the manufacture of low-cost metal structures. Defendant Universal is a New York corporation engaged in the sale of prefabricated plastic housing units and defendant Tobman is its president, director, and major shareholder.

In January, 1976 a finder introduced Tobman to Chromalloy, which was interested in entering the housing market. In February,

---

1. Arrow became a division of Chromalloy in July 1979.

1976 the parties began discussion of the possible acquisition of Universal by Chromalloy, and on May 7, 1976 William McGavock, Chromalloy's executive vice president, sent Tobman a letter of intent setting forth conditions precedent to consummating the acquisition. The letter made it clear that the contemplated transaction was subject to the execution and delivery of a definitive agreement. It set forth that "[n]either party shall have any liability nor in any way be committed to the other on account of the proposed transaction unless a definitive Agreement is executed. . . ., and thereafter any liability shall be only under the terms of the definitive Agreement." This letter of intent was never confirmed and approved on behalf of Universal.

Chromalloy abandoned the idea of acquiring Universal because Universal was a start-up company with no established earnings record. Chromalloy instead considered the possible formation of a Chromalloy-Universal joint venture in the manufacture and sale of plastic housing. This prospective joint venture was to be for a period of four or five years, at the end of which Chromalloy would have the option to buy out Universal's interest in the joint venture at a price based on the joint venture's earnings. McGavock sent to Tobman a letter of intent dated June 25, 1976, setting forth a proposal to form a joint venture corporation in which each party would own 50%. The letter of intent by its terms disclaimed any intention by the parties to bind themselves contractually, and set forth conditions precedent to the formation of a joint venture. It clearly stated that neither party would be committed until a joint venture agreement was executed. This proposed letter of intent was never confirmed and approved on behalf of Universal.

Negotiations continued concerning the form of the prospective joint venture and the amount of capital contribution. Tobman prepared projections of Universal sales and profits. Chromalloy began to assist Universal in developing advertising, and authorized the use of Chromalloy's logo on Universal stationery and purchase orders.

On October 11, 1976 Universal and Chromalloy executed a loan agreement, under which Chromalloy agreed to loan Universal $100,000. By the terms of the loan agreement, the $100,000 was to be used by Universal as working capital, or to acquire the assets of Extrudyne, Inc., a public corporation which manufactured plastic extrusion forms.[2] The loan agreement contained a specific disclaimer of any present intention on the part of Chromalloy to make a capital contribution to the prospective joint venture, although it did provide that Chromalloy, in its sole discretion, could apply the principal amount of the loan as a capital contribution to the joint venture upon the consummation of a joint venture agreement, at which time the note would be cancelled. The loan agreement further provided that it did not constitute a letter of intent binding the parties to the formation of a joint venture.

On October 22, 1976 Chromalloy loaned $100,000 to Universal under the loan agreement, and Universal executed and delivered to Chromalloy its promissory note for $100,000, personally guaranteed by Tobman and payable upon demand after January 1, 1977. The note obligated Universal to pay attorney's fees and costs incurred in the event collection became necessary. Tobman obtained from the other shareholders of Universal a signed agreement to indemnify him against any claims against him by Chromalloy arising out of the $100,000 loan. The $100,000 loan was reflected as an indebtedness to Chromalloy on Universal's tax returns and on its financial statements. On February 24, 1977 Tobman sent McGavock a letter enclosing payment of interest for the months of October, 1976 to February, 1977 in the amount of $3,030.

A revised proposed letter of intent dated October 25, 1976, with respect to the prospective joint venture, was sent by Chromalloy on November 8, 1976 to Universal. It contained provisions similar to those in the June 25, 1976 letter, disclaiming any

2. Extrudyne, Inc. was, at the time, virtually insolvent.

intention by the parties to bind themselves contractually, and clearly stating that neither party would be committed until a joint venture agreement was executed. While this proposed letter of intent was not confirmed and approved on behalf of Universal, Tobman on December 9, 1976 returned to Chromalloy a letter of intent (dated November 21, 1976) which had been confirmed and approved on behalf of Universal and which contained the same disclaimers.

During this period and thereafter, up to September 6, 1977, Chromalloy and Universal continued to negotiate concerning the terms and conditions of various drafts of a joint venture agreement. Certain of the drafts provided that "for accounting purposes" the joint venture would be deemed to have come into existence on January 1, 1977.

In the meantime Chromalloy and Universal had various business relationships. Chromalloy agreed to assist Universal in fulfilling its obligation under a contract to produce housing for a project for Leon De-Matteis & Sons, Inc. in Saudi Arabia, since Universal did not have the necessary resources for this contract. Beginning on January 1, 1977, Arrow started to provide Universal with various services such as accounting, purchase order processing, engineering, and financial planning. The accounting and financial services were rendered at a monthly charge of $3,000. An Arrow employee, Jerry Paner, joined Universal on a full-time basis as its sales manager to promote Tobman's concept of plastic housing. When the DeMatteis project encountered difficulties, Arrow sent an engineer to the project site. Chromalloy, after being indemnified by Tobman and other Universal directors, guaranteed a $300,000 line of credit granted Universal by the Chemical Bank to finance purchase orders and the shipment of goods so that Universal could fulfill its contract with DeMatteis. Chromalloy agreed to confirm Universal's credit to vendors of Universal, and informed them that Chromalloy and Univer-

sal were in the process of forming a joint venture.

Universal and Chromalloy maintained separate bank accounts; throughout the period of their negotiations Universal controlled its own finances; and Chromalloy had no control over Universal's bidding for jobs. No profits or losses were shared by Chromalloy and Universal, although Universal made almost $600,000 in net profits from the DeMatteis contract.

One obstacle to the successful conclusion of negotiations over the proposed joint venture was Universal's acquisition of the outstanding stock of Extrudyne, Inc. in 1976. On February 18, 1977, Chromalloy's counsel wrote Tobman indicating that possible violations of the disclosure provisions of the securities laws might have been entailed in connection with the acquisition by Universal of Extrudyne, and that this created an impediment to the proposed joint venture. Chromalloy agreed to assist Universal in rectifying any problems which might exist in connection with the acquisition of Extrudyne.

Numerous revisions and redrafts of proposed joint venture agreements were exchanged in May, June, July, and August, 1977, but the parties were unable to reach a final agreement. In August Chromalloy proposed to Tobman that Chromalloy would invest $100,000 in the joint venture, and that the $100,000 loan outstanding would be converted into and would constitute that capital contribution. Chromalloy would then make a new loan to the joint venture of $100,000 which would be repaid from the first $100,000 of profit. This arrangement was not satisfactory to Tobman.

On September 6, 1977, with a variety of issues in addition to the question of capital contribution still unresolved, negotiations were terminated by Chromalloy.[3] McGavock wrote to Tobman making formal demand upon Universal for repayment of the loan of $100,000. In November, 1977 Anthony Dato, financial vice president of Arrow, sent letters to Universal vendors to the

---

3. The Extrudyne matter, the buy-out formula and the terms of Tobman's employment con-

tract were all material issues which were still unresolved when negotiations were terminated.

effect that the joint venture had not materialized. When defendants failed to pay the note, plaintiffs brought this action.

## III.

Chromalloy seeks to recover the unpaid loan principal and accrued interest, and reimbursement of attorney's fees and costs incurred in connection with the loan which Universal agreed to pay under the terms of the note (Count 1); and calls upon Tobman to honor his unconditional written personal guarantee of the loan (Count II). Arrow seeks payment by Universal of invoices for management services Arrow rendered and for goods and materials delivered to Universal (Count III), and damages from Universal for its failure to pay for 48 units of prefabricated worker houses allegedly manufactured at its request (Count IV).[4]

Defendants do not deny that the goods and services for which plaintiffs seek to recover were actually rendered. Instead they contend that the parties entered into an oral joint venture agreement on April 22, 1976 for a 4-year duration, and that the Chromalloy-Universal joint venture and not Universal alone should be charged.[5]

The defendants counterclaim for breach of the joint venture agreement. Universal seeks damages for sums expended in furtherance of the operations of the joint venture in reliance upon its continued existence (First Counterclaim), and for costs and legal fees in defending against plaintiffs' action (Second Counterclaim). It also seeks damages for injury to its credit and reputation resulting from plaintiff's communications with Universal suppliers and customers (Third Counterclaim). Tobman seeks his costs and legal fees in defending against plaintiffs' action (Fourth Counterclaim), and damages for losses he incurred by divesting himself of other business interests to devote himself at the request of plaintiffs to the joint venture (Fifth and Sixth Counterclaims).[6]

## IV.

A joint venture has been defined to be "an informal partnership between two or more persons for a limited undertaking or purpose." *Backus Plywood Corp. v. Commercial Decal, Inc.*, 208 F.Supp. 687, 690 (S.D.N.Y.1962), *aff'd in relevant part*, 317 F.2d 339 (2d Cir.), *cert. denied*, 375 U.S. 879, 84 S.Ct. 146, 11 L.Ed.2d 110 (1963), *quoting Wooten v. Marshall*, 153 F.SUpp. 759, 763 (S.D.N.Y.1957). "It is indispensable to a contract of partnership or a joint venture, both under the common and statutory law, that there be a mutual undertaking not only to share the profits of a business but to submit to the burden of making good losses as well." *Steinbeck v. Gerosa*, 4 N.Y.2d 302, 317, 175 N.Y.S.2d 1, 13, 151 N.E.2d 170, 178, *app. dismissed*, 358 U.S. 39, 79 S.Ct. 64, 3 L.Ed.2d 45 (1958). Other important elements of a joint venture are joint control over the property, joint contribution of property, financial resources, efforts, skill or knowledge; and an agreement manifesting the intent of the parties to be associated as a joint venture. *Flammia v. Mite Corp.*, 401 F.Supp. 1121 (E.D.N.Y.1975), *aff'd*, 553 F.2d 93 (2d Cir. 1977).

There was no sharing of profits nor joint control of the property in the instant case. Universal controlled its own bank account and bid on various jobs without Chromal-

---

4. Universal took delivery of 24 units and refused to accept the remaining 48 which Arrow is holding in inventory for the account of Universal.

5. With respect to the services of Kendrioski, the engineer sent to help install the units of the DeMatteis project, defendants appear to assert that those services were rendered for the benefit neither of Universal nor of the joint venture but rather for the benefit of defendant Arrow. (Tobman Aff. ¶ 21). This conclusory statement, however, does not raise a disputed fact

issue. Defendant Tobman does not allege that Arrow said Kendrioski was being sent to serve Arrow's own purposes, nor that there was any understanding between Arrow and Universal that his services would be compensated by Arrow.

6. The Fifth Counterclaim alleges that plaintiffs requested Tobman to divest himself of outside interests to devote himself to the joint venture, and that he did so. The Sixth Counterclaim alleges that he did so in reliance on the false and fraudulent representations of plaintiffs.

loy's participation. Universal did not share with Chromalloy the more-than-$500,000 profit it made on the DeMatteis contract. Defendants do not claim that Chromalloy shared profits or losses with it; to the contrary, they complain that Chromalloy never contributed any property to the alleged venture.

Orders were solicited in the name of "Universal-Chromalloy," and Universal was allowed to use the Chromalloy logo for this purpose. An agreement between the parties covered that use of the logo, and provided that "in the event [the] joint venture is not consummated" Universal would immediately cease using Chromalloy's name and logo. Letters from Chromalloy to Universal's suppliers characterize the joint venture as prospective rather than actual.[7]

█ Whatever bearing the use of Chromalloy's name and logo might have on the liability of Chromalloy to third parties who relied thereon, it does not, in the context of the other evidence in this case, tend to establish the parties' intention to function as a joint venture. On the basis of the undisputed facts I draw the inevitable conclusion that no joint venture ever came into existence.

█ The undisputed facts establish not only that no joint venture existed, but also that the parties were not bound by any contractual arrangement at all. If parties "contemplate a reduction to writing of their agreement before it can be considered complete, there is no contract until the writing is signed." *Scheck v. Francis*, 26 N.Y.2d 466, 311 N.Y.S.2d 841, 260 N.E.2d 493 (1970). This rule obtains even if the parties have orally agreed upon all the terms of the proposed contract. *Schwartz v. Greenberg*, 304 N.Y. 250, 107 N.E.2d 65 (1952).

Whether it was the intent of the parties to be bound only by a formal writing is a question of fact, *ABC Trading Co. v. Westinghouse Electric Supply Co.*, 382 F.Supp. 600 (E.D.N.Y.1974), and in this case it can be resolved on undisputed facts which admit of no other conclusion. In both *Scheck, supra* and *Schwartz, supra*, the existence of written contracts, in one case unsigned, in the other undelivered, was conclusive evidence of such an intent. In this case, a series of draft agreements were drawn up but never executed. The correspondence between the parties not only refers to a written agreement, but expressly disclaims any intention to be bound until the execution of such a document. In addition, there is ample evidence that the parties failed to agree on material terms—including the nature of Chromalloy's contribution and the terms of Tobman's employment.

█ Even if it were possible for a trier of fact to find that the parties intended to form an oral joint venture it would be barred by the Statute of Frauds. The Statute of Frauds in pertinent part provides:

Every agreement, promise, or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed to by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking:

1. By its terms is not to be performed within one year from the making thereof

. . . Gen.Obl.L. § 5–701 (McKinney).

It is undisputed that the joint venture agreement if it was ever consummated was to last for four years. (Defendants Exh. B, 11; Exh. D, No. 30(f)). The defendants do not urge that the parties executed a written joint venture agreement or a written employment contract for Tobman. (Defendants Exh. E, p. 326). By the very terms which defendants ascribe to the agreement, the alleged joint venture cannot be shielded from the operation of the statute of frauds. It has long been held that an oral contract forming a partnership to be continued be-

---

**7.** The defendants have also introduced memoranda from Jerry Paner describing the joint venture as an ongoing enterprise. Paner's statements are those of an employee who had no part in negotiating the arrangement, and therefore do not reflect the intentions of the parties. A letter from Anthony Dato, financial vice president of Arrow, requesting financial data from Tobman for inclusion in a "Five Year Plan" for the Chromalloy consumer group has been adequately explained by inclusion of a copy of the Five Year Plan: the joint venture projections are listed under "acquisitions in closing", and not under "existing units."

yond one year is subject to the statute. *Wahl v. Barnum*, 116 N.Y. 87, 22 N.E. 280 (1889).[8]

■ Faced with the bar of the statute of frauds if a joint venture exists, defendants argue that the sole effect of the statute is to convert the agreement into a partnership at will. In *Boxill v. Boxill*, 201 Misc. 386, 111 N.Y.S.2d 33 (Sup.Ct., N.Y.Cty., 1952), the plaintiff alleged that she and the defendant had agreed to be partners for the purpose of leasing certain premises and operating a rooming house for three years. Although the agreement was within the statute of frauds, the court found that because the parties had an ongoing relationship in which they contributed monies and shared profits and losses, a partnership at will existed. A great injustice would have resulted if plaintiff had been deprived of the fruits of many years labor. In the instant case, by contrast, there was never any participation by Chromalloy in the operations alleged to have been jointly undertaken. Chromalloy was not unjustly enriched by those operations; defendants kept the profits which accrued during the period in which the joint venture was allegedly in existence. (Defendant's Exhibit D, 15–16; E–1 556–600). In *Boxill*, the defendant did not deny that an oral agreement had been reached. Here the plaintiffs not only disclaim their intention to enter into such an agreement but have produced written disclaimers as well. This case, then, is an inappropriate candidate for application of the equitable doctrine urged by the defendants.

■ Additionally, defendants seek to avoid the bar of the statute of frauds by relying upon the doctrine of promissory estoppel. This doctrine has been applied where one party has changed his position in reliance on representations of another party. As the Court of Appeals for the Second Circuit has stated: "[T]he doctrine of promissory estoppel is properly reserved for that limited class of cases where 'the circumstances are such as to render it unconscionable' to deny the promise upon which the [party] has relied." *Philo Smith & Co. v. USLIFE Corp.*, 554 F.2d 34 (2d Cir. 1977). Evidence must be offered to show that the promise was fraudulently made, *Bulkley v. Shaw*, 289 N.Y. 133, 139, 44 N.E.2d 398 (1942), and that (as applicable to the case at bar) plaintiffs anticipated that defendants would rely on the oral promise, that the reliance was reasonable, that defendants engaged in acts unequivocally referable to the oral promise, and that they suffered substantial injury as a result of those acts of reliance. *Philo Smith & Co. v. USLIFE Corp.*, 420 F.Supp. 1266 (S.D.N.Y.1976), aff'd, 554 F.2d 34 (2d Cir. 1977).

■ Defendants have not produced evidence showing that these elements are satisfied. They have failed to adduce evidence that the plaintiffs intended to mislead them when they entered into the alleged April 22 "handshake" agreement. In light of all the written disclaimers of contractual liability which were made, any reliance on the existence of a joint venture agreement was unreasonable. The action purportedly taken in reliance on this agreement—expenditures on advertising and promotion, divestiture of other business interests—are not "unequivocally referable" to the oral agreement; they could just as easily be attributed to Universal's own business interest in exploiting the market for worker housing or to its anticipation that a joint venture agreement would be consummated. *Cf. Philo Smith, supra*, 420 F.Supp. at 1273.

■ For the same reason, Tobman's counterclaims based on induced divestiture of his other business interests (Fifth and

---

**8.** While there are cases which seem to suggest that "joint ventures" are outside the scope of the statute of frauds, *e. g. Yonofsky v. Wernick*, 362 F.Supp. 1005 (S.D.N.Y.1973), those cases are not applicable here. The exception has been limited to joint venture agreements to make purchases of real estate from third parties or to transact with third parties other business which is covered by the statute. *Backus Plywood Corp. v. Commercial Decal, Inc.*, 317 F.2d 339 (2d Cir.), *cert. denied*, 375 U.S. 879, 84 S.Ct. 146, 11 L.Ed.2d 110 (1963). Where, as here, the joint venture agreement itself is subject to the statute by virtue of the length of its term, the joint venture character of the agreement will not affect the result; "the inapplicability of the statute of frauds to joint venture agreements does not protect transactions between coadventurers that are otherwise subject to the statute." *Yonofsky, supra* at 1026.

Sixth Counterclaims) must fail. Those counterclaims appear to be predicated on promissory estoppel (Fifth Counterclaim) and fraud (Sixth Counterclaim). The written disclaimers tend to negate fraud and render any reliance unreasonable. Tobman's divestiture of his other interests could just as easily be attributed to his growing commitment to the manufacture of prefabricated worker housing and the expectation that the joint venture would be consummated as to misrepresentations by the plaintiffs. In addition, the statement which forms the basis of the Sixth Counterclaim is not a misrepresentation of a material fact, but rather a suggestion, or at worst a command by the plaintiff that the defendant Tobman divest himself of outside business interests.

My finding that no joint venture existed mandates summary judgment on Arrow's claim for unpaid management services (Count III) and its claim for housing units manufactured to Universal's specifications (Count IV),[9] and disposes of all of the defendants' counterclaims with the exception of Universal's counterclaim for injury to business reputation.

## IV.

 Universal's only defense to Chromalloy's claim on the promissory note (Count I) is that it was fraudulently induced to sign the note by plaintiffs' false representations that they intended the money as a capital contribution but were compelled to disguise it as a loan in order to avoid difficulties with the SEC, and by plaintiffs' promise, which they never intended to keep, that the loan would be converted to a capital contribution within a short time. While parol evidence ordinarily is admissible to establish fraud in the inducement of a contract, specific disclaimers in the contract of the representations purportedly relied on will defeat the fraud claim. *Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 184 N.Y.S.2d 599, 157 N.E.2d 597 (1959). The loan agreement, incorporated by reference in the promissory note, contains such specific disclaimers:

> This agreement does not constitute a letter of intent or agreement between the parties regarding a possible joint venture and shall not bind or otherwise commit the parties to the formation of such a joint venture or in any other way.

Since only the existence of a joint venture could have constituted the $100,000 a capital contribution, I find that this specific disclaimer defeats Universal's claim that such a contribution was intended.[10]

 Tobman's only defense to Chromalloy's claim on his personal guarantee (Count II) is also predicated on promissory fraud. Tobman has submitted evidence that he was induced to sign the guarantee by plaintiffs' promises, which they never intended to keep, that his personal guarantee would be removed in ten days. Parol evidence is admissible to void a contract on the grounds of promissory fraud.[11] Restatement of Contracts, § 238(b); Sweet, Promissory Fraud, 49 Calif.L.Rev. 877, 889 (1961). Accordingly, Tobman has raised an issue of fact with respect to the enforceability of his personal guarantee which precludes the entry of summary judgment.

---

**9.** It is undisputed that the housing units were manufactured in response to Universal's order for 22 such units, and that the additional 48 were produced because it was not economical to run any fewer. The 48 surplus units were inventoried to Universal's account and warehoused by Arrow. The hardware for the 48 units was shipped to Universal. Defendants contended that the units were being held for the joint venture. Since I have found that the joint venture never came into being, the units either belong to Universal, in which case it must pay for them, or to Arrow. Defendants have not adduced any evidence suggesting that the parties intended the units to belong to Arrow and they have not refuted plaintiffs' evidence that the units were held in Universal's inventory, were manufactured to Universal's specifications and that Universal intended to sell them as it secured orders. On the basis of these undisputed facts I find that they belong to Universal and Universal is liable for their purchase price.

**10.** This matter is referred to Magistrate Buchwald to hear and report with respect to the amount of legal fees, costs and disbursements in the collection of the note.

**11.** Plaintiffs have contended that the loan documents contain specific merger clauses which, under New York law, would bar the fraud

■ Universal's remaining counterclaim for injury to its credit and reputation has no factual basis in this record. Universal relies on letters sent from Chromalloy to Universal's suppliers notifying them that the proposed joint venture had not materialized. Defendant has failed to identify any misrepresentations in these letters or any evidence of an intent to injure Universal. Chromalloy's obvious concern with protecting itself from liability to third parties who had received correspondence on Universal-Chromalloy stationery is the only motive which can be inferred from this record.

SO ORDERED.

claim being asserted. *See Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 184 N.Y.S.2d 599, 157 N.E.2d 597 (1959). Even assuming that Missouri law, which governs construction of the guarantee, is in accord with New York law in this respect, I do not find in the guarantee any specific disclaimers that representations were made concerning the duration of the guarantee.