**PAYROLL EXPRESS CORP., Plaintiff,**

v.

**The AETNA CASUALTY AND SURETY CO., Defendant.**

**No. 80 Civ. 3176.**

United States District Court,
S. D. New York.

Dec. 5, 1980.

Robert Fink, New York City, for plaintiff.

Kenneth W. Malamy, Hendler & Murray, New York City, for defendant.

## OPINION AND ORDER

LEVAL, District Judge.

This is an action seeking to enjoin the cancellation of an insurance policy. The plaintiff Payroll Express Corporation is a New Jersey corporation engaged in the business of making payroll deliveries. The

defendant Aetna Casualty and Surety Company has provided Payroll with dishonesty, disappearance and destruction insurance under a series of contracts beginning in 1972. On May 2, 1980, without prior warning, the Aetna served on Payroll notices of cancellation of certain provisions of the policy and on May 20 served notice of cancellation of the policy, to be effective June 21, 1980. Those actions gave rise to the present litigation. Payroll promptly sought a temporary restraining order contending that the terms of the policy forbade such cancellations. The restraining order was granted and was subsequently continued in effect by stipulation of the parties until November 24, 1980 while they attempted to resolve their differences. Trial was begun on November 20, the cancellation of the policy being further voluntarily deferred to December 24 to permit time for hearing and adjudication.

[1] Throughout the time in question Payroll Express has been engaged in the business of making payroll deliveries for its customers. The customers, characteristically large employers with a sizable payroll, make wire transfers to Payroll's bank of funds sufficient to meet the customer's payroll. Payroll, using its own vehicles, drivers, messengers and guards, transports the money to the customer's work site and there distributes the cash to the customer's labor force. Payroll's contracts with its customers require it to keep in effect an insurance policy against dishonesty, destruction and disappearance, a standard form of insurance commonly referred to in the industry as a 3D policy, or more generally as crime insurance. As of February 7, 1972 the Aetna began to provide Payroll with such coverage. The Aetna's standard form 3D policy contains no reference to duration, except for the statement in Section 16 that the policy is cancellable at any time on 15 days prior notice. Robert Felzenberg, the president of Payroll, had explained to the Aetna that he could not live with a policy cancellable on short notice because of the nature of Payroll's work and because of Payroll's contractual guarantees to its customers. Accordingly for 1972, the

Aetna issued a letter to the effect that "The company agrees to provide coverage . . . for a period of one year . . . ." from the effective date of February 7, 1972. (PX 18, 18a) There was some confusion as to whether Aetna had reserved by another paragraph a right to terminate on 30 days notice. Felzenberg sought clarification. Throughout this time Payroll had an excellent record in terms of freedom from losses. Felzenberg was constantly urging the Aetna to extend guaranteed longer term coverage. His objective was to obtain permanent non-cancellable coverage leaving the insurer free to change premiums as experience dictated.

Because of Payroll's excellent loss-free record, in 1973 the Aetna agreed to extend its coverage to three years. Upon the renewal effective February 7, 1973 a new Special Endorsement No. 3 was issued which provided in paragraph 1 "The company agrees to provide coverage . . . for a period of three years from the effective date . . ." (PX 27) from February 7, 1973 to February 7, 1976. At the first anniversary of this three year policy, the Aetna issued a new Special Endorsement No. 3 in similar terms to the effect that the Aetna would provide coverage for three years until February 7, 1977. (PX 28) A year later a similar special endorsement was issued for the period February 7, 1975 to February 7, 1978, accompanied by a letter agreeing to maintain the premiums within certain limits throughout the period. (PX 29)

Felzenberg remained concerned with the short duration of his policies. He regarded it as an essential cornerstone of his business to have crime insurance dependably in place against which to issue contractual guarantees to his customers. It troubled him that, operating under a three year policy, at the end of one year he had only two remaining years of guaranteed insurance and no assurance of premium levels thereafter.

Thus in the end of 1975 as the expiration of the first year of the 1975 policy approached, Felzenberg renewed his quest for permanent, non-cancellable insurance. His

concept was a policy which the Aetna would be required to maintain in effect permanently, providing that at the expiration of each year, the Aetna would set and guarantee the amount of the premium for the third year to come. Felzenberg pressed his request with Richard La Hue, an officer in the Aetna's Hartford home office who was in charge of the Payroll insurance contract. An appointment was made for Felzenberg to meet with La Hue at the Aetna's Hartford home office. What occurred at this meeting is the subject of dispute and conflicting testimony. Felzenberg contends that at this meeting the Aetna agreed to adopt his concept of permanent insurance with a guaranteed third year premium to be fixed at the expiration of every year. La Hue contends that the Aetna agreed to no such thing and remained firm in its refusal to grant what Felzenberg had been asking for several years. It is apparent that La Hue believed himself to have agreed to something different from its prior policy. For shortly after the meeting, La Hue instructed John Schramm, the Aetna's Albany office bond manager that either he or Peter Bennett (a former Aetna employee now employed by Marshall and Sterling, Aetna's agent for the Payroll coverage) should "design for [La Hue's] approval" a "Letter to Insured re non/can and premium level." (PX 30) Schramm apparently passed this assignment on to his subordinate Frank Maranto, who was in charge of the day to day operations of the Payroll policy, who in turn passed it on to Peter Bennett, as La Hue's memo had suggested. Bennett prepared a draft of these provisions in letter form, providing for the signature on behalf of the Aetna of Frank Maranto, Attorney-in-Fact. Schramm sent Bennett's draft to La Hue for approval. La Hue made two minor changes, not here significant, and otherwise approved the draft for issuance by the Aetna on February 19, 1976. (PX 31)

On that day, pursuant to the negotiations which had taken place, the Aetna issued a new policy to Payroll effective February 7, 1976 which combined into a single policy the various types of insurance which previously had been set forth in two separate policies, and in accordance with La Hue's approval of the Bennett draft, a letter was issued dated as of February 7, 1976. The interpretation of that letter is the focal point of this litigation. It provided as follows (PX 1B):

Dear Mr. Felzenberg:

Payroll Express Corp.

Policy No. 10 BY 1580 BCA

Please be advised the following conditions are to apply to the above captioned policy.

(1) The Aetna Casualty & Surety Company agrees that the first paragraph Section No. 16 of the policy, dealing with the cancellation of policy or insuring agreement, is deleted in its entirety. The only exception to this will be failure on the part of the insured to pay the required premium, in which case, the company will have the options of cancellation under Section No. 16 of the policy.

(2) The Aetna Casualty & Surety Company further agrees that they will not decrease the limits of coverage on the above-captioned policy unless requested to do so by the insured.

(3A) The premium charge for the above-captioned policy is for the period February 7, 1976 to February 7, 1979, and is agreed to be $55,365. per year.

(B) This premium shall not be changed unless there is a merger or consolidation with some other concern or unless the insured purchases additional limits or coverages. .

(4) The Aetna Casualty & Surety Company further agrees that, upon expiration of each of the policies' premium anniversary years, a new third year premium will be developed and will become a guaranteed cost, subject to 3B above.

Very truly yours,

The Aetna Casualty and

Surety Company

/s/ Frank S. Maranto, Jr.

Frank S. Maranto, Jr.

Attorney-in-Fact

Payroll operated under this policy for a year, again with a highly satisfactory loss experience. In February 1977, instead of following the procedure outlined in the letter of February 7, 1976 of notifying a new third year premium, the Aetna issued a new letter dated February 7, 1977, identical in terms to the letter of February 7, 1976 (modified in that all relevant dates and periods were advanced by one year). The premium for the initial three year period under the 1977 letter was set slightly higher than the three year premium which had been fixed by the letter of February 7, 1976. (PX 1A)

This marked the end of Payroll's loss-free experience and the end of happy relations between it and the Aetna. During 1977 Payroll's vehicles suffered armed robberies and claims were made on the policy.

Special Endorsement No. 1 of Payroll's policy included Limits of Liability depending on the amount of protection provided by Payroll for the particular payroll being transported. In spite of the provisions of this endorsement Aetna wished to require Payroll to provide greater protection to maintain the limits of liability. Disputes developed over the payment of Payroll's loss claims. Aetna presented to Payroll through Aetna's agent Marshall and Sterling a new Special Endorsement No. 1 which seriously reduced the limits of liability depending on the amount of protection. Aetna's transmittal letter stated that the new endorsement "must be attached to the above policy." (DX PB 2D) When Schramm made reference in a memo to "decreasing" the limits of coverage (PX 72), La Hue reproached him for his unhappy choice of words, saying "[M]ay we again remind you we are not decreasing the limits but rather changing the warranty of protection afforded. Therefore, we do not feel we are in violation of our agreement with the Insured dated February 7, 1977." Payroll, however, recognized that its non-cancellation agreement protected it from the imposition of any such terms having the effect of decreasing coverage or limits. It refused to accept the endorsement. (PX 74)

Relations between insurer and insured became strained and unfriendly. Internal memoranda at the Aetna began to accuse Payroll of unreasonableness in refusing to accept Aetna's modifications. Furthermore Aetna's personnel began to speak of their desire to "get off the risk," which meant to cancel the policy. When February 7, 1978 came around Aetna did not furnish a new third year premium as required by the February 7, 1977 letter. Instead Aetna made further efforts to convince Payroll to accept an endorsement controlling the protection provided for payroll deliveries. Finally in April 1978 the Aetna delivered to Payroll a letter such as was due on February 7, 1978 setting the premium for the year February 7, 1980 to February 7, 1981 at $159,410 (a huge increase over the previous year's premium). The letter went on to state that if Payroll accepted an endorsement of the type which the Aetna had demanded, the premium would be reduced to $124,570. (DX 02)

La Hue by this time was determined to get off the risk and was considering issuing an advice of cancellation. Schramm advised that it might be more prudent to consult counsel first. In May 1978 La Hue accordingly sent a copy of the Feb. 7, 1977 letter to Kenneth Jacobson, in-house counsel at the Aetna's Hartford home office, asking him "Per Section 1) what do you think would happen if we issued direct cancellation?" (PX 36). Jacobson answered the inquiry with a brief memorandum advising:

> Our letter to the insured of February 7, 1977, purporting to amend the policy captioned above, has the unusual effect of eliminating the right to cancel on the part of both the insured and the insurer, except in the case of cancellation for nonpayment of premium. Therefore, at least during the three year policy period, I believe that this insured could successfully challenge in court any direct notice of cancellation we might issue. (PX 37)

In the meantime a further robbery loss occurred. It was then decided that Schramm would consult the firm of Carter,

Conboy, Bardwell, Case & Blackmore, outside counsel used by Aetna's Albany bond office. These attorneys rendered a formal opinion (PX 40) to the effect that the Aetna had no right to cancel the policy at any time, having agreed to the deletion of the cancellation clause and having effectively agreed to grant insurance for an indefinite term with the right to change the premium in the manner provided.

On July 11, 1978 La Hue noted in writing "Discuss again with John (Schramm) ... consider cancellation/maybe only consequence injunction to keep policy in force. What lost?" (PX 39)

Concern over the potential liability if cancellation caused the collapse of Payroll's business caused La Hue for the time to abandon his thoughts of cancelling the policy in violation of Aetna's obligations. However, when February 7, 1979 came around, no letter was delivered by the Aetna setting the premium for the year 1981 to 1982. Likewise on February 7, 1980, no letter was delivered setting the premium for the year 1982 to 1983. On April 20, 1979, La Hue wrote to Munch, the new manager of the Albany bond department, "As you know, we are forced to live with this risk until February 7, 1981, but outside counsel's opinion notwithstanding, maybe we are better off to cancel and take our chances on getting sued." (PX 42)

In the fall of 1979, Aetna again searched for a means of getting off the policy. La Hue consulted a lawyer in Aetna's Claim Department who advised against cancellation. A strategy was developed to offer Payroll concessions in the form of better coverage in exchange for elimination of the non-cancellation provisions. La Hue advised the Albany bond representative on Dec. 20, 1979 "We do see this option. Have Payroll Express describe exactly what coverage they want including maximum limits and the maximum amount of self-insurance. We will propose rewriting the policy effective February 7, 1980, for one year and give them a specimen copy of our form for approval. We will make it as attractive as we can and still retain the sanity of underwriting. The price for the present limits will be no greater than the $160,207 already billed. By accepting our new policy they will acknowledge cancellation of 10 BY 1580." (PX 61)

While the possibilities of success of this strategy were under consideration, George Blick, Assistant Vice President in Aetna's home office claim department, undertook to obtain a further opinion of counsel. He wrote in February 1980 to Jerome Murray of the firm of Hendler & Murray explaining that the problem was "a seemingly uncancellable policy we have executed according to the firm of Carter, Conboy, et al. I believe the policy can be terminated, but will abide by your review and decision." (PX 43) Murray responded in April 1980 with a letter and legal memorandum to the effect that the contract was cancellable for two reasons:—First, in the attorney's opinion, the letter of Feb. 7, 1977 providing for the deletion of the cancellation clause was given without consideration and was therefore revocable at will. Second, paragraph 15 of the standard form policy, which permitted the Aetna to cancel the coverage as to any employee, could be construed to permit cancellation as to all of Payroll's drivers and messengers effectively terminating the coverage. (PX 44) Mr. Blick forwarded Murray's opinion letter to La Hue with a covering memorandum stating "I have had Attorney Murray phrase it thusly so that in the event of any litigation by Payroll Express, we are protected." (PX 44)

In consultation with the Murray firm La Hue made plans for the cancellation of the policy. Finally on May 2, 1980, without ever previously having mentioned the possibility of cancellation to Payroll, Aetna delivered two letters, one cancelling the non-cancellation provision of the Feb. 7, 1977 letter, the other cancelling coverage for all drivers and messengers. (PX 5, 6). These were followed by the notice of May 20, 1980, cancelling the policy, effective June 21, 1980. Payroll promptly instituted this action.

*     *     *     *     *     *

Plaintiff Payroll Express contends that the policy is permanently non-cancellable under the letters of February 7, 1976 and 1977, except for nonpayment of premium.

As against this contention, the Aetna argues that a contract should not be construed to create a permanent obligation absent a very clear contractual statement to that effect.

The Aetna seems at various times to have advanced, either through its lawyers or through the testimony of its employees, six different interpretations of the effect or meaning of the non-cancellation provisions. They are as follows: First, the policy was cancellable at any time because the non-cancellation provisions were merely a gentlemen's agreement set forth in a separate letter and not a part of the policy. Second, the policy was cancellable at any time because the non-cancellation provisions expressed in the letter of February 7, 1977 were without consideration and therefore revocable at will. Third, coverage under the policy was effectively cancellable at any time through Section 15 which permitted the Aetna to cancel as to any employee and hence as to any class of employees, such as drivers and messengers. Fourth, the policy was non-cancellable for three years, but cancellable at any time thereafter—three years being the premium period set forth in paragraph 3A of the February 7, 1976 and 1977 letters. Fifth, the policy was non-cancellable for four years, by reason of the Aetna's having voluntarily set a fourth year premium through the letter delivered on April 13, 1978. (DX 02) Sixth, the policy was non-cancellable for five years in that the "premium anniversary years" on whose expiration the Aetna was obligated to develop a new guaranteed third year premium were the first year and the second year, but not the third year which is the "premium expiry year." (an argument not advanced by counsel, but seemingly implicit in some of La Hue's testimony).

The first two arguments concerning the status and revocability, or non-binding nature, of the February 7 letters do not command serious attention. As to lack of consideration, the Aetna argues that since the premium under the 1976 and 1977 letters was no higher than it would have been without such a letter, the Aetna should be seen as having received no consideration for deletion of the cancellation clause. A bundle of rights and obligations cannot be picked apart in this fashion. As of February 7, 1976, the Aetna entered into a newly-structured agreement with Payroll of which the non-cancellation letter was a part. Although the policy was retroactively effective to February 7, 1976, it was not put in final form or delivered until February 19, 1976, at which time all of its provisions including the non-cancellation letter were delivered to Payroll. The premium was payable in consideration of all of the terms of the insurance being granted. There is no basis for the contention that the non-cancellation provisions were an agreement without consideration. The same observations apply to Aetna's reissuance on February 7, 1977 of the non-cancellation letter in virtually identical terms specifying a slightly higher annual premium.

Nor does any legal or contractual significance attach to the fact that these provisions were set forth in a letter, rather than an endorsement. It is true that section 19 of the printed conditions on the standard form 3D policy issued by the Aetna provided, "[N]or shall the terms of this Policy be waived or changed, except by endorsement issued to form a part of this Policy signed by an officer of the Company." (PX 1) It is also true, as Aetna's counsel has demonstrated by pointing to the absence of appropriately placed staple holes, that the February 7, 1976 letter was not stapled into the policy when these were sent to Payroll on February 19th. Nonetheless, from the creation of the first non-cancellation letter through the time of the institution of this litigation, all of Aetna's personnel, as well as Payroll's, regarded those letters as establishing legally binding conditions with respect to the policy. It would be unfair and impermissible for Aetna now to rely on fine print in its form to defeat the understanding and expectation of both parties throughout the history of the contract that

the February 7 letters were contractually binding. The answer to Aetna's contentions is that the February 7 letters were "endorsements" within the meaning of section 19 and within the understanding of the parties despite the fact that the word endorsement did not appear on them. Alternatively, Aetna waived the applicability of section 19 with respect to those letters. I recognize that La Hue intentionally, and not by inadvertence, chose to have these provisions expressed in a letter. (PX 30) He testified that he wanted this outside the policy. (T. 451) Whatever were La Hue's reasons for wanting this unusual agreement in letter form, rather than as an endorsement, he testified that he recognized that the Aetna had bound itself legally by the issuance of the letter. (e.g., T. 506, 509, 510, 524). Had La Hue issued the letter leading Payroll to believe it had a binding contract while secretly relying on a belief that the Aetna was not contractually bound, this might have raised a serious issue of equitable estoppel by reason of fraud. *See Special Event Entertainment v. Rockefeller Center, Inc.*, 458 F.Supp. 72 (S.D.N.Y.1978); *Philo Smith & Co. v. U. S. Life*, 420 F.Supp. 1266 (S.D.N.Y.1976), aff'd, 554 F.2d 34 (2d Cir. 1977); *Metropolitan Life Ins. Co. v. Childs Co.*, 230 N.Y. 285, 130 N.E. 295, *reh. den.*, 231 N.Y. 551, 132 N.E. 885 (1921); *Rose v. Spa Realty Assoc.*, 42 N.Y.2d 338, 397 N.Y.S.2d 922, 366 N.E.2d 1279 (1977).

Aetna's reliance on its right to cancel "as to any employee", set forth in section 15 of the standard form printed terms of the 3D policy, is also misplaced. It is absolutely clear from the conduct of the parties that neither side ever understood this term as permitting the Aetna to get off the risk by wholesale cancellation of classes of essential covered employees. From 1972 through 1976, the most important subject annually negotiated between Felzenberg and the Aetna was the duration of Payroll's protection against cancellation. Felzenberg testified that he discussed with La Hue every possible way in which Aetna could cancel the coverage so as to assure himself that all possibilities were covered. If Section 15 permitted the Aetna to cancel all drivers and messengers as purportedly done in the May 2, 1980 cancellation notice, all of the annual negotiations from 1972 to 1976 in which the Aetna, bit by bit, gave up increasingly large chunks of its cancellation rights were meaningless. What is clearest of all is that none of the Aetna team which negotiated and lived under these contracts ever regarded Section 15 as a contractual right to get off the risk. The internal memoranda flowing between the Albany bond office and La Hue show that from mid-1977 through early 1980 Aetna was desperate to find any possible way to cancel its exposure on this risk. Twice La Hue speculated in writing that it might be worthwhile to cancel in spite of the contractual bar. Four times Aetna consulted lawyers to see if any way could be found to get Aetna off the risk, and never once did the Aetna personnel direct the lawyers' attention to section 15 to inquire whether it would serve that role. The idea that rescue could be found in the terms of section 15 was first suggested by the attorney Murray in his opinion letter delivered in April, 1980. I find, reading the contract in its entirety and considering the negotiations of the parties, that the interpretation which Aetna now seeks to put on section 15 is contrary to the understanding which both sides had in entering into the contract. This section was intended to give Aetna protection against employees suspected of dishonesty or unreliability by permitting Aetna to cancel protection as to such employee without having to show proofs or establish reasonable cause. It was not intended to permit Aetna to terminate coverage across the board or to override and nullify the non-cancellation provisions which had been specifically negotiated every year for five straight years. La Hue testified in his deposition, furthermore, that the Aetna had never previously, to his knowledge, used section 15 in this fashion. (La Hue dep. 281)

Turning now to the interpretation of the February 7 letters of 1976 and 1977, both sides rely on parol evidence of contract ne-

gotiations, Payroll to show that the contract was understood by all to be permanently non-cancellable, the Aetna to show that this demand had been rejected. While parol is admissible under the circumstances when offered not to contradict the terms of the contract but to clarify the intended meaning of unclear terms, see Corbin, The Parol Evidence Rule, 53 Yale L.J. 603, 622 (1944), the evidence offered is not particularly illuminating. Both sides offer evidence of the discussions which occurred in the end of 1975 at which the 1976 renewal was negotiated. Felzenberg testified that his request for permanent non-cancellable coverage was accepted at that meeting and was subsequently reflected in the letter of February 7, 1976. La Hue testified that permanent non-cancellability had been rejected at that meeting. In support he proffers certain hand-written notes drawn from his files which, based on not terribly convincing circumstances, he speculates must have been taken at that meeting, on which he wrote, "take time stipulation out of non-can?? *No.*" Peter Bennett in his deposition testimony demonstrated a poor recollection of those negotiations. Because of these conflicts the evidence of the December 1975 discussions is not particularly helpful in construing the February 7, 1976 letter. I do not doubt the sincerity of Felzenberg's testimony that he believed permanent non-cancellability was agreed to, nor do I doubt that he has believed ever since that time that his contract so provided. Nonetheless, it does not necessarily follow that there was a meeting of the minds in December 1975 as to this term. Payroll draws some support from La Hue's conduct. The fact that La Hue wanted these provisions in a letter, outside the body of the policy indicates that he had some concern as to what he had agreed to. The fact that he instructed Schramm that Schramm or Bennett should "design" for his approval the "non-can and premium level" terms acknowledges La Hue's awareness that he had agreed to something significantly different from the prior contract—something which required "designing". Although these factors do help to demonstrate that

Aetna had agreed to non-cancellation going significantly beyond the previous agreement (which is apparent without need for this evidence from the face of the February 7 letter), this proof is not particularly helpful in suggesting which of the longer-term interpretations discussed below is correct. I attach little or no weight to the parol evidence, primarily because it is of scant assistance.

The letters themselves, although not clear as to which of two possible longer-term interpretations is intended, do clearly negate Aetna's contentions that the non-cancellation clause was of shorter duration.

Aetna's first position (as a fallback from its previously discussed arguments that the letters had no binding force whatsoever) is that the provision of paragraph 1, deleting cancellation rights under section 16, is applicable only to the three year period set forth in paragraph 3A. Aetna accordingly argues that the 1976 letter meant more or less the same as what had been agreed to in 1975. I find this position untenable, for it reduces to a nullity the provisions of paragraph 4 under which:

> "The Aetna Casualty & Surety Company further agrees that, upon expiration of each of the policies' premium anniversary years, a new third year premium will be developed and will become a guaranteed cost. . . . ."

This provision not only speaks in language which is mandatory against the Aetna but also in terms of a guaranteed cost to Payroll. It was obviously perceived as important in the parties' negotiations, but would be reduced to a virtual nullity if Aetna were permitted, having guaranteed the cost of the third year premium, to cancel coverage for that year.

Once again, it is clear that La Hue never believed himself to have such a right (although he testified to the contrary). First, in 1978 La Hue regarded himself as bound to furnish a new third year premium for the year 1980 to 1981. He admitted this at times on cross-examination. (T. 506; see also 524) He approved such a letter in

April of 1978, over two months late and only after spending practically a year searching for a way to be relieved of the obligations of the policy. He also had sought during this year to find a way to get Payroll to accept a modification of the limits of coverage but had been unsuccessful. He would not have authorized the letter extending coverage for another year if he had not viewed this as obligatory. And had La Hue believed in 1977 that Aetna had the right to cancel the coverage for the extended year, he would certainly have told this to Payroll as an inducement to secure acceptance of the modifications he wanted so badly.

Furthermore, through the fall of 1979 and the first months of 1980, La Hue was deeply engaged in devising a strategy to get Payroll to relinquish its rights under the non-cancellation letter by offering rich coverage which would be unprofitable for Aetna but lasting only a relatively short time. It is inconceivable that La Hue would have been engaged in such scheming if he had believed that in a few weeks the Aetna would have a contractual right to cancel coverage. On August 20, 1979, La Hue wrote to the Albany bond department, "As you know, we are forced to live with this risk until February 7, 1981, but outside counsel's opinion notwithstanding, maybe we are better off to cancel and take our chances on getting sued." (PX 42) The Aetna Albany bond representative wrote La Hue on December 4, 1979, "Considering our inability to cancel the policy outright, we should be looking towards the renewal of February 7, 1981." (PX 46)

I find that the Aetna's own understanding of its contractual obligations under the letters of February 7, 1976 and 1977, included the understanding that the non-cancellation provisions of paragraph 1 would be applicable not only to the three year period set forth in paragraph 3A but to the additional years required under the provisions of paragraph 4.[1]

A second possible interpretation, which is not advanced by Aetna's counsel, is to the effect that once Aetna had delivered the 1978 letter setting the premium and extending coverage for the period February 7, 1980 to February 7, 1981, the coverage became non-cancellable for that period but not beyond. For the reasons set forth in the immediately preceding discussion, I find that such a construction would not be tenable. The February 7 letters obligated the Aetna to set new third year premiums as a guaranteed cost. The non-cancellation provision applied to such third year extensions as Aetna was obligated to give, not merely to such third year extensions as Aetna decided to give. La Hue conceded in his cross-examination that under the terms of the February 7, 1977 letter the Aetna was obligated in 1979 to furnish a premium for the year 1981 to 1982. (T. 524) (Compare La Hue dep. 125) I find no defensible basis for limiting Aetna's obligation not to cancel to four years.

The contention that the non-cancellation clause was effective for a period of five years was implicit in aspects of La Hue's sometimes contradictory testimony. What is apparent from an examination of the terms of paragraph 4 is that the Aetna's obligation to set a new third year premium fell "upon expiration of each of the policies' premium anniversary years . . . .". Therefore once having determined that the non-cancellation obligations of paragraph 1 remained effective as to extensions mandated by paragraph 4, the crucial question becomes what is signified by the words "premium anniversary years." La Hue testified that according to his understanding each of the first two years of the three year period specified in paragraph 3A was a premium anniversary year. He sought to distinguish the third year of the three year premium period by designating it as the "premium

---

1. It is interesting to note that the Aetna's attorneys did not advance this interpretation in advising the Aetna in April of 1980 that it was free to cancel. (PX 44) While parties and their counsel are of course free to develop new contentions of law for litigation without penalty for having failed to think of them earlier, this circumstance does tend to confirm as a matter of *fact* that the Aetna never regarded its commitment as being for three years only.

expiry year". T. 452–62. According to this interpretation the non-cancellation provision would apply during the first three years set forth in paragraph 3A and during the fourth and fifth years as to which premiums were required to be set under the provisions of paragraph 4. The Aetna, however, has offered no basis other than La Hue's simple assertion for distinguishing between the expirations of the first two years and the expiration of the third year. The fact that the premium initially set for a three year period under paragraph 3A was due to expire at the end of the third year is in no way inconsistent with the expiration of the third year being a premium anniversary. The premium expiry date was also a premium anniversary date, and the reasoning which makes the non-cancellation clause of paragraph 1 applicable to the fourth and fifth years under paragraph 4 equally requires that it be applicable to the sixth year.

The exclusion of three, four and five year non-cancellation as possible interpretations of the contract leaves two remaining possibilities: First that the policy had a duration of six years during which time it was non-cancellable; second that the policy was non-cancellable in perpetuity (except in either case for failure to pay the required premium).

Choosing between these two interpretations requires a decision whether paragraphs 3A and 4 serve only to describe the method for determination of premiums or whether in addition they also serve the function of specifying a duration for the policy. The answer to that question will accordingly determine the meaning of the words "upon expiration of each of the policies' premium anniversary years . . . ."

Under the construction advocated by the plaintiff Payroll, only paragraph 1 refers to the duration of the policy. It eliminates Aetna's option to cancel except for non-payment of premium. Under this interpretation the only function played by paragraph 3A is to specify the amount of the premium for the first three years, and the only function served by paragraph 4 would be to prescribe the timing and the method for determination of premium in all years subsequent to the first three. On this reading, each successive February 7 would mark the expiration of a "premium anniversary year" for as long as Payroll kept the policy in effect, and on each successive February 7, the Aetna would be required by paragraph 4 to set the premium for the third year to come.

The other meaning, as suggested above, gives additional significance to paragraph 3A, which states (in the 1976 letter) "The premium charged for the above-captioned policy is for the period February 7, 1976 to February 7, 1979, and is agreed to be $55,-365. per year." This awkward and unclear language seems to be referring to a policy period as well as to a premium amount. One cannot help but observe how much more easy and natural it would have been to state in paragraph 3A, "The premium shall be $55,365 per year for each of the first three years", if that had been all that was intended. If, on the other hand, one reads paragraph 3A as setting a three year policy period as well as fixing three years of premium, then the expiration of each of the three premium years under paragraph 3A will be the occasion under paragraph 4 for fixing the premium for an additional third year. The policy will accordingly have a duration of six years, throughout which time the non-cancellation provisions of paragraph 1 will be applicable.

To me the words of the letter do not argue convincingly for either reading over the other. Nor do I find any persuasive indications of what was the Aetna's understanding at the time in question. While it is clear that throughout the duration of this contract La Hue, Schramm and others were concerned about the non-cancellation provision, there is no way of telling whether their concern was over several years of non-cancellability or an eternity.

Mindful of the authority cited by Aetna to the effect that courts should be wary of construing contracts as creating obligations in perpetuity absent a clear and unequivocal statement of that intention, *see Warner-*

*Lambert Pharmaceutical Co. v. John J. Reynolds, Inc.*, 178 F.Supp. 655, 661 (S.D.N.Y.1959), *aff'd on opinion below*, 280 F.2d 197 (2d Cir. 1960); *Haines v. City of New York*, 41 N.Y.2d 769, 772, 396 N.Y.S.2d 155, 157, 364 N.E.2d 820, 821 (1977); *Mitler v. Friedeberg*, 32 Misc.2d 78, 85, 222 N.Y.S.2d 480, 488–89 (Sup.Ct., N.Y. County, 1961); *See generally* 1 *Williston on Contracts* § 38 at 113 (3d Ed. 1957), I conclude with some misgivings that this contract as expressed in the letter of February 7, 1977, was not binding for as long as Payroll continued to pay premiums, but created an obligation on Aetna to furnish to Payroll non-cancellable insurance for six years from February 7, 1977 through the same date in 1983.

Although there is substantial authority to the effect that in appropriate instances courts should construe ambiguities against the drafting party, especially as to contracts of insurance, *see* 3 *Corbin on Contracts* § 559 (1960 Ed.), I do not believe this is an appropriate case for the application of that doctrine. In the first place, the term in question was a unique negotiated term, drafted explicitly to reflect the agreement, and not a pre-set "adhesion" form dictated by the insurer. Payroll would have been free to offer drafts, suggest modifications or request clarifications of Aetna's letter, as indeed Felzenberg had done in 1972. Secondly, the doctrine suggesting construction against the drafting insurer has a more logical application to disputes after the fact over the payability of a claim than to the question whether the insurer has bound itself to provide further insurance in the future, at least absent a showing that the insured was prejudiced by reliance on its expectation of the insurance remaining in force. See discussion and cases cited in 3 *Corbin* § 559, *supra*.

It is somewhat troublesome that if asked in February 1976 what was the meaning of their agreement, probably neither side would have explained it as a six year non-cancellable contract. Plaintiff would have believed the commitment was permanent. What Aetna would have said is hard to determine. La Hue's testimony (and his perceptions from 1977 to 1980) are so full of contradictions, both explicit and implicit, one wonders whether he ever made a careful analysis of the scope of Aetna's agreement. The draft of the 1976 letter was prepared by Bennett, on instructions relayed from La Hue to Schramm to Maranto to Bennett, without any writing specifying what was to be the content of the letter. Nor is there any indication that an oral message of any precise content was relayed through that chain. What seems clear is that La Hue knowingly agreed to a non-cancellation clause with a significantly longer duration than the three year guarantee given by the Aetna the previous year. It cannot be determined whether the present inconsistency and lack of coherence of La Hue's perceptions is attributable to his never having analyzed thoroughly the precise duration of the non-cancellation clause, or his having done so but faultily, or to his perceptions having been colored by subsequent events including the suggestions of the various lawyers to have opined on the matter.

In any event both sides had knowingly agreed to non-cancellability of a duration significantly exceeding the three years previously contracted. The manifestation of that agreement was in a writing in which I find some ambiguity as to whether the intended term was for six years or without limit. Construing the term as one for six years gives appropriate deference to the cautionary policy of avoiding perpetual commitments which have not been clearly expressed, accords generally with the manifested understandings of the Aetna at the time in question, and accords substantially with Payroll's expectation and understanding, even though Payroll believed the term was unlimited.[2]

---

**2.** Since the written manifestation accords substantially (although perhaps not precisely) with the understandings of both parties and with the overall purpose of the contract as understood by both, this is not a case for voiding of an illusory contract by reason of fundamental misunderstanding. *See Raffles v. Wichelhaus*, 2 H. & C. 906 (1864); 3 *Corbin on Contracts* § 538, *supra*.

**394**

■ Regardless whether the commitment was for six years or in perpetuity, it is clear that Aetna's cancellation in May of 1980 was in breach of its obligations.

The remaining question is the availability to Payroll of injunctive relief, which turns essentially on whether Payroll will be irreparably harmed by the Aetna's withdrawing insurance in breach of its obligations or whether Payroll can be adequately compensated by a damage remedy. Considerable testimony was received by way of deposition as to Payroll's lack of success in finding substitute insurance over the last year. What is not altogether clear is whether this lack of success was attributable to the fact that Payroll's agents were seeking to place a permanent non-cancellable policy or whether insurance cannot be found even for a reasonably modest duration. I have no doubt that it would cause irreparable harm to Payroll to permit Aetna to cancel without Payroll's having had an ample opportunity to place substitute contracts of insurance. On the other hand it does not follow that an injunction should be issued binding the Aetna to the full remaining duration of its contract. Given a reasonable time, Payroll will either have succeeded or failed in securing substitute insurance. At such time, Aetna should be permitted, free of injunction, to perfect its breach, leaving Payroll with its damage remedy.

Judgment will be granted in favor of the plaintiff. The Aetna is hereby enjoined from cancelling Payroll Express Corporation's Policy No. 10 BY 1580 BCA prior to August 7, 1981.

Submit judgment on notice.

So ordered.