**PAYROLL EXPRESS CORPORATION,**
**Plaintiff-Appellant, Cross-Appellee,**

v.

**The AETNA CASUALTY AND SURETY**
**COMPANY, Defendant-Appellee,**
**Cross-Appellant.**

**No. 1304, Docket No. 81–7100.**

United States Court of Appeals,
Second Circuit.

Argued May 28, 1981.

Decided Sept. 9, 1981.

---

Robert F. Fink, New York City (George L. Graff, Milgrim Thomajan Jacobs & Lee, P. C., New York City, of counsel), for plaintiff-appellant, cross-appellee.

Kenneth W. Malamy, New York City (Jerome Murray, Hendler & Murray, New York City, of counsel), for defendant-appellee, cross-appellant.

Before FEINBERG, Chief Judge, and LUMBARD and MANSFIELD, Circuit Judges.

MANSFIELD, Circuit Judge:

In this diversity action for breach of an insurance contract Payroll Express Corporation (Payroll), a company which makes payroll deliveries for employers, appeals from a judgment of the Southern District of New York, Pierre N. Leval, *Judge*, entered after a non-jury trial, holding that a policy issued to it by the defendant, The Aetna Casualty and Surety Company (Aetna), insuring it against dishonesty, destruction and disappearance of payrolls (known as "crime" insurance) is not cancellable except for non-payment of premiums until February 7, 1983, and enjoining Aetna from cancelling before August 7, 1981. The defendant cross appeals, claiming that the policy was at all times cancellable. We reverse that part of the decision holding the policy cancellable after February 7, 1983, and direct that the judgment be modified to enjoin Aetna permanently from terminating except for non-payment of premiums

due. In all other aspects the decision is affirmed.

Since the facts are fully and thoroughly set forth by Judge Leval in his decision, 504 F.Supp. 383, and his findings are supported by the record, we will limit ourselves to a summary of the highlights. Payroll is in the business of cashing on location payroll checks or vouchers of employees of companies that hire it. Those companies wire the necessary funds to Payroll's account and Payroll then pays the employees cash. As part of its contracts with these businesses Payroll must have insurance against the loss of their payrolls due to crime. Since February, 1972, that insurance has been provided by Aetna. The first paragraph of § 16 of Aetna's printed policy provides in pertinent part that "This Policy or any Insuring Agreement may be cancelled by the Company by mailing to the Insured at the address shown in this Policy written notice stating when not less than fifteen days thereafter such cancellation shall be effective."

From the beginning of its relationship with Aetna Payroll has sought to obtain non-cancellable insurance, because its ability to market its services would be enhanced if it could point to such insurance and because it feared that the consequence of an untimely cancellation of its insurance could be the failure of the company. In response to Payroll's requests Aetna in 1972 issued an ambiguous letter which agreed to provide coverage for one year from the effective date of the policy but also permitted Aetna on 30 days' notice to elect not to continue coverage and provided that if Payroll failed to pay premiums Aetna could cancel under § 16.

Payroll continued to seek non-cancellable insurance. Robert Felzenberg, its President, pressed Aetna for permanent non-cancellable insurance under which Aetna would periodically adjust the amount of the premiums to be paid. Aetna eventually responded by issuing a letter endorsement to its renewal of the policy, effective February 7, 1983, that provided coverage for three years, i. e., until February 7, 1976, and permitted Aetna to cancel under § 16 for non-payment of premiums. In 1974, on the anniversary of this policy, a new special endorsement was issued, similarly guaranteeing coverage for three years, until February 7, 1977. Aetna also set fixed guidelines for changing premiums over the three years. A similar three-year guarantee was issued in 1975, extending coverage to February 7, 1978. Again, fixed limits for the premium charges were set.

Felzenberg was still unsatisfied with the limited-duration guarantee of Payroll's coverage. At the end of 1975 he renewed his request for a permanently non-cancellable policy, with Aetna setting the premium for each year three years in advance. He and Richard LaHue, the Aetna officer in charge of the Payroll contract, held a meeting on the subject, attended by other Aetna personnel, at which they agreed to change the terms of the policy. Felzenberg testified that LaHue agreed to make the policy noncancellable. LaHue testified that he refused to do so, but was unclear as to exactly what the agreed-upon change was. Shortly after the meeting Aetna issued a letter stating the terms of the agreement, and LaHue approved it before it was sent to Payroll. The letter was prepared by LaHue's staff in response to his instruction to "design for approval" a "Letter to Insured re non/can [non-cancellation] and premium level." It provided:

"February 7, 1976
Robert M. Felzenberg, President
Payroll Express Corp.
295 Lyons Avenue
Newark, New Jersey 07112
Dear Mr. Felzenberg:
Payroll Express Corp.
Policy No. 10 BY 1580 BCA
Please be advised the following conditions are to apply to the above captioned policy.

1) The Aetna Casualty & Surety Company agrees that the first paragraph section No. 16 of the policy, dealing with the cancellation of policy or insuring agreement, is deleted in its entirety. The only exception to this will be fail-

ure on the part of the insured to pay the required premium, in which case, the company will have the options of cancellation under section No. 16 of the policy.

2) The Aetna Casualty & Surety Company further agrees that they will not decrease the limits of coverage on the above-captioned policy unless requested to do so by the insured.

3A) The premium charge for the above-captioned policy is for the period February 7, 1976 to February 7, 1979, and is agreed to be $55,365. per year.

B) This premium shall not be changed unless there is a merger or consolidation with some other concern or unless the insured purchases additional limits or coverages.

4) The Aetna Casualty & Surety Company further agrees that, upon expiration of each of the policies' premium anniversary years, a new third year premium will be developed and will become a guaranteed cost, subject to 3B above.

Very truly yours,

The Aetna Casualty and Surety Company

/s/ Frank S. Maranto, Jr.

Frank S. Maranto, Jr.

Attorney-In-Fact"

Aetna simultaneously issued a new policy combining the two previous policies covering Payroll, which was made effective February 7, 1976. On February 7, 1977, Aetna issued another letter (the "1977 letter") signed by John Schramm, office bond manager at Aetna's Albany, New York, office, pursuant to LaHue's instructions and with his approval, which was identical to the 1976 letter except that the dates were advanced by a year and the premium was higher.[1]

During 1977 Payroll experienced a number of armed robberies and made claims on the policy. Aetna, concerned about its loss exposure and the elimination of its right to cancel except for non-payment of premi-

ums, sent Payroll a new special endorsement substantially decreasing the limits of coverage under the policy, which Payroll refused to accept on the ground that it was protected against decreases in coverage by the 1976 and 1977 letters. By early 1978 Aetna officials concluded that the Payroll policy presented an unacceptable risk and should be terminated or substantially altered. Aetna did not send Payroll the notice of a third year guaranteed premium that its 1977 letter obligated it to send around February 7, 1978. It again attempted to obtain Payroll's acceptance of an endorsement limiting liability, and Payroll again refused. In April it finally sent a letter setting the new third year (1980–81) premium at $159,410 (an increase from $55,-530). The letter also contained an offer to reduce the premium if Payroll accepted the policy modifications requested.

In his search for a way to cancel the policy LaHue sent the 1977 letter to in-house counsel, who advised that the policy was non-cancellable for at least three years. This was followed by a formal opinion of outside counsel that Aetna had no right to cancel at any time. Aetna officials then decided against cancelling because of fear of its potential liability if cancellation caused Payroll to lose substantial amounts of business. On the next anniversary of the policy, February 7, 1977, Aetna again failed to set a third year (1981–82) premium.

In April, 1980, another Aetna officer, George Blick, obtained an opinion of counsel from the law firm of Hendler & Murray to the effect that the policy could be cancelled on two grounds: (1) no consideration had been given by Payroll for Aetna's agreement in the 1977 letter to delete the cancellation clause, and (2) since § 15 of the original policy allowed Aetna to cancel coverage as to "any employee" Aetna could, by cancelling as to *all* of Payroll's drivers and messengers, in effect cancel the entire policy. Blick wrote, "I have had Attorney

---

1. This letter was apparently sent in order to set the premiums for the next three years, even though a year earlier the premium had been guaranteed at a lower rate for the years 1977- 78 and 1978–79. The new, higher premium applied to 1977–78, 1978–79, and 1979–80. The increase was, however, insignificant.

Murray phrase it thusly so that in the event of any litigation by Payroll Express, we are protected."

On May 2, 1980, Aetna sent Payroll two cancellation letters. The first "cancelled" the provisions of the February 7, 1977, letter; the second invoked § 15 to cancel coverage for all of Payroll's messengers and drivers. On May 20, 1980, Aetna sent Payroll a letter cancelling the policy *in toto* as of June 21, 1980. Payroll then sued for a declaratory judgment that these purported cancellations were void and the policy non-cancellable.

After a non-jury trial at which both sides introduced oral testimony as to the circumstances surrounding Aetna's 1976 and 1977 letters deleting the cancellation clause except for non-payment of premiums, Judge Leval on December 5, 1980, filed a written opinion holding that Aetna's May 1980, cancellation letters constituted a breach of its contract. He rejected LaHue's testimony that the letters were not intended to preclude Aetna from cancelling the policy at will and found that they constituted endorsements, under which, in response to Felzenberg's demands, Aetna agreed that the policy would be non-cancellable rather than continue in effect merely for a three-year or four-year period, as argued by Aetna. He also rejected Aetna's contentions that the letters were unenforceable for lack of consideration and that § 15 of the policy, which permits "cancellation as to any employee" for dishonesty, entitled it to terminate coverage as to all Payroll employees.[2] The parties' entry in February, 1976, of a "newly-structured agreement" with fresh obligations undertaken by both sides was held to provide adequate consideration for deletion of the non-cancellation clause. In addition, the higher premiums agreed to and paid by Payroll under the terms of the 1977 letter were held to provide consideration. Judge Leval further found that § 15 was intended only to give Aetna protection against specific employees suspected of dishonesty or unreliability and not "to permit Aetna to terminate coverage across the board or to override and nullify the non-cancellation provisions which had been specifically negotiated over years for five straight years."

Notwithstanding his finding that the non-cancellation clause was intended by the parties to be effective for an unlimited period, Judge Leval concluded that if the period were not restricted in time the agreement might violate New York's policy against construing obligations as being in perpetuity in the absence of a clearly expressed unequivocal intention. Accordingly, he concluded "with some misgivings" that the non-cancellation clause should be binding "for six years from February 7, 1977, through the same date in 1983."

Since Aetna's breach of the policy contract threatened Payroll with irreparable harm unless and until Payroll was able to negotiate a substitute contract of insurance elsewhere, Judge Leval enjoined cancellation by Aetna, other than for non-payment of premiums, until August 7, 1981, following which it might then cancel the policy at will on four months' written notice. From this decision both sides appeal.

## DISCUSSION

In plain language the 1976 and 1977 letters, which were drafted and executed by Aetna, provide that the policy is non-cancellable by Aetna except for non-payment of premiums. Moreover, the duration of the policy thenceforth was no longer limited in time. The earlier 1973, 1974 and 1975

**2.**  "CANCELLATION AS

TO ANY EMPLOYEE

"Section 15. Insuring Agreement I shall be deemed canceled as to any Employee: (a) immediately upon discovery by the Insured, or by any partner or officer thereof not in collusion with such Employee, of any fraudulent or dishonest act on the part of such Employee; or (b) at noon, standard time as aforesaid, upon the effective date specified in a written notice mailed to the Insured. Such date shall be not less than fifteen days after the date of mailing. The mailing by the Company of notice as aforesaid to the Insured at the address shown in this Policy shall be sufficient proof of notice. Delivery of such written notice by the Company shall be equivalent to mailing."

endorsement letters expressly stated that Aetna "agrees to provide coverage under the above captioned policy for a period of three (3) years from the date of its endorsement." No such limitation on the new policy's duration is found in the 1976 and 1977 endorsements. Thus, while premium charges payable by Payroll might under the terms of the letters be increased by Aetna, the policy was to continue in effect as long as Payroll paid the premiums and it would be cancellable only for non-payment of premiums. Nothing in the record supports the district court's conclusion that the policy should be in effect only for six years, i. e., until September 7, 1983, a determination with which neither party agrees.

In view of the express language of the policy as modified by the 1976 and 1977 letters it is questionable whether parol evidence regarding its duration was admissible. But even if the contract be deemed ambiguous as to its duration, the testimony of the two principals who negotiated it, Felzenberg and LaHue, coupled with Aetna's internal interpretation of the policy, leaves no doubt that its duration was to be unlimited except upon non-payment of premiums. Felzenberg testified that this was what he sought and, as Judge Leval found, it was Felzenberg's understanding of what he had obtained by way of a commitment. The testimony of LaHue to the effect that he merely intended to enter into some sort of non-binding agreement regarding cancellability, was rejected by Judge Leval who found "that LaHue never believed himself to have such a right (although he testified to the contrary)" and that LaHue "knowingly agreed to a non-cancellation clause with a significantly longer duration than the three year guarantee given by Aetna the previous year." Moreover, Aetna's argument that LaHue intended to retain the right to cancel for reasons other than non-payment of premiums is inconsistent with (1) his frantic search for ways to force Payroll to relinquish its non-cancellation rights, (2) the express three year guarantee of premium costs (which would be meaningless if Aetna could cancel at will), (3) his continued but unsuccessful efforts to induce Payroll to accept a modification of the coverage limits, and (4) his internal memoranda recognizing his inability to cancel.

■ Aetna's first contention, that the 1976 and 1977 letters are not part of the binding insurance contract, must be rejected. The record clearly supports the district court's findings that the parties intended the letters, although they did not expressly so state, to be part of the policy and that Aetna waived the policy's merger provision, § 19.[3] At all times Aetna's officials believed the letters to be binding on it. LaHue testified that "he recognized that Aetna bound itself legally by the issuance of the letters." Aetna's internal memoranda refer to each of the letters as the "rider" or "non-cancellation policy" or "non-cancellation provision." Frank S. Maranto, who signed the February 7, 1976, letter as "Attorney-in-Fact" for Aetna, testified that in doing so he bound Aetna. Moreover, Aetna's awareness that Payroll also understood the letters to be binding (they were issued in response to Payroll's efforts to obtain a binding commitment of non-cancellability) estops Aetna, in the absence of some contemporaneous contrary statement by it (and none exists), from claiming that the letters were not part of the contract, once Payroll, in reliance on the letters, paid premiums and accepted the policy, thereby foregoing efforts to obtain coverage elsewhere. See *Special Event Entertainment v. Rockefeller Center, Inc.*, 458 F.Supp. 72, 76–77 (S.D.N.Y.1978); *Philo Smith & Co., Inc. v. USLIFE*

3. "CHANGES

"Section 19. Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or a change in any part of this Policy or estop the Company from asserting any right under the terms of this policy; nor shall the terms of this Policy be waived or changed, except by endorsement issued to form a part of this Policy signed by an officer of the Company.

"By acceptance of this Policy the Insured agrees that it embodies all agreements existing between the Insured and the Company or any of its agents relating to this insurance."

*Corp.*, 420 F.Supp. 1266, 1271–74 (S.D.N.Y. 1976), *affd.*, 554 F.2d 34 (2d Cir. 1977); *Hueber Hares Glavin Partnership v. State*, 75 A.D.2d 464, 429 N.Y.S.2d 956 (4th Dept. 1980). To hold otherwise would be to countenance what would amount to a fraud on Aetna's part. As the parties clearly understood, the letters amounted to endorsements of the insurance contract.

■ Nor do we find any merit in Aetna's contention that the non-cancellation provision of the contract, as expressly stated in the letter endorsements, must be held not binding for lack of consideration. Ample consideration existed in the renewal of the parties' undertakings in 1976 and 1977 with modifications and in the extension of the contract period, for which the specified premium charges were to be paid by Payroll in an increased amount.

■ We are also unpersuaded by Aetna's argument that the letter endorsements are illusory and therefore not binding since under their terms Aetna is permanently bound, whereas Payroll may cancel at any time simply by not paying premiums. This contention overlooks the fact that Payroll has already performed in part by paying substantial premiums under the terms of the 1977 letter endorsement in exchange for Aetna's promises, including its agreement not to cancel. Under the circumstances there is no requirement of mutuality for enforcement of such partially performed aleatory contracts. See *Exercycle Corp. v. Maratta*, 9 N.Y.2d 329, 335, 214 N.Y.S.2d 353, 356, 174 N.E.2d 463, 465 (1961); 1A *A. Corbin, Corbin on Contracts* § 163 at 76 (1963). Indeed to hold otherwise would be to render unenforceable most life insurance contracts, which may be cancelled by the insured only for non-payment of premiums but by the insured at will.

■ Aetna next contends that Judge Leval erred in finding null and void its May 2, 1980, letters, which purported under § 15 of the policy to cancel the coverage of all drivers and messengers. However, § 15 was clearly intended to give Aetna the right to cancel coverage only as to individu-al drivers, not the insured's employees en masse. Even if § 15 were treated as ambiguous, the understanding of the parties at the time that the contract was entered into, which is supported by the record, was found by the district court to preclude this interpretation. Moreover, the history of Aetna's conduct in attempting to avoid the non-cancellation provision of the 1976 and 1977 letters is inconsistent with such an interpretation, which was simply the brainchild of an accommodating law firm brought into the picture after two earlier opinions by other counsel to the effect that the policy was non-cancellable except for non-payment of premiums. Since in cases of ambiguous provisions of an insurance contract the intention of the parties, if discernible, governs, see *McGrail v. Equitable Life Assurance Society*, 292 N.Y. 419, 424–25, 55 N.E.2d 483, 486 (1944); *J. G. A. Construction Corp. v. Charter Oak Fire Insurance Co.*, 66 A.D.2d 315, 318, 414 N.Y.S.2d 385, 387 (4th Dept. 1979), the district court's holding that Aetna had no right to cancel pursuant to § 15 was correct.

■ We next turn to the district court's determination that, although the contract was to be in effect for a period "significantly exceeding the three years previously contracted," its duration was indefinite and, unless the court limited it to a fixed term, the contract would violate New York's policy of avoiding perpetual commitments. This determination was error. As we have previously recognized, New York limits that policy to contracts having no termination provisions and has held it inapplicable to contracts of the type before us here, which do provide for termination or cancellation upon the occurrence of a specified event. *Warner-Lambert Pharm. Co. v. John J. Reynolds, Inc.*, 178 F.Supp. 655 (S.D.N.Y. 1959), *affd. per curiam on opinion below*, 280 F.2d 197 (2d Cir. 1960) (contract to pay royalties as long as party manufactured certain product); *Ketcham v. Hall Syndicate, Inc.*, 37 Misc.2d 693, 236 N.Y.S.2d 206 (Sup.Ct.1962), *affd. on opinion below*, 19 A.D.2d 611, 242 N.Y.S.2d 182 (1st Dept. 1963) (agreement to create and provide cartoons indefinitely, subject to termination

upon artist's share of revenue falling below stipulated amount); *Ehrenworth v. George F. Stuhmer & Co.*, 229 N.Y. 210, 128 N.E. 108 (1920) (agreement to sell bread to an exclusive distributor as long as both parties remained in business); *Matter of Exercycle v. Maratta*, 11 A.D.2d 677, 201 N.Y.S.2d 885 (1st Dept. 1960), *affd.*, 9 N.Y.2d 329, 214 N.Y.S.2d 353, 174 N.E.2d 463 (1961) (employment agreement terminable upon sale of less than stipulated minimum of exercycles while employee was vice-president in charge of sales).

In *Warner-Lambert* a contract entered into by the parties back in 1881 obligated the pharmaceutical manufacturer to pay royalties on every gross of "Listerine" made and sold by it as long as it continued to manufacture the product. The court, applying New York law in a diversity case, noted that where a contract contains no provisions for termination, the court will look to the intention of the parties, absent which the contract will be held "terminable within a reasonable time or revocable at will, dependent upon the circumstances," 178 F.Supp. at 661. However, where the parties, while providing no fixed "date for the termination of the promisor's obligation . . . condition the obligation upon an event which would necessarily terminate the contract," *id.*, no such presumption of perpetuity is justified and they will be deemed to have accepted the obligation to continue until the condition occurs. Accordingly, the court held that the obligation to pay royalties continued in effect unless and until Warner-Lambert ceased manufacturing Listerine.

■ Applying these principles, the parties here expressly agreed through the 1976 and 1977 letter endorsements that Aetna could terminate the policy upon Payroll's failure to pay premiums due. There is therefore no need to invoke the presumption against construing contracts as "perpetual," a term which "serves only to confuse," 178 F.Supp. at 161. Aetna, after repeated negotiations, had previously granted a three-year non-cancellable policy. Then beginning in 1976, in response to additional bargaining pressure by Felzenberg, Aetna agreed to grant Payroll additional protection against cancellation. There was no evidence that the new agreement was for anything less than permanent non-cancellability except for non-payment of premiums.

Construction of the agreement as obligating Aetna to continue to provide coverage as long as Payroll paid premiums set by Aetna does not work any undue hardship or unfairness of the type sought to be avoided by the policy against perpetuity, since Aetna under the terms of the policy remains free, within the limits allowed by law, to fix the premium rates according to the risks undertaken by it. Accordingly, we reverse the district judge's decision that the policy may be cancelled by Aetna at will after September 7, 1983, and hold that the policy may not be cancelled by Aetna as long as Payroll continues to pay the premiums lawfully fixed by Aetna as they become due.

■ There remains the question of whether Payroll is entitled to the injunctive relief sought by it, which depends on whether money damages would be an inadequate remedy. If not, specific performance must be granted. *Guinness-Harp Corp. v. Jos. Schlitz Brewing Co.*, 613 F.2d 468, 473 (2d Cir. 1980); *Monclova v. Arnett*, 3 N.Y.2d 33, 163 N.Y.S.2d 652, 143 N.E.2d 375 (1957). The record is clear that Payroll will probably be unable to obtain non-cancellable insurance in lieu of its Aetna policy, but that it might be able to obtain cancellable insurance elsewhere. However, a policy cancellable at will or for a limited period is not an adequate substitute for one that is cancellable only upon non-payment of premiums. Moreover, the difference in premiums for a policy cancellable at will and one cancellable only for non-payment of premiums is so highly speculative as to be plainly impossible of any accurate measurement, since the premiums for each type of policy would periodically be changed in the future. Damages would therefore be an inadequate remedy. Nor are there any offsetting equities militating against a grant of equitable relief in the present case. Aetna is in a

position to protect itself by exercise of its unilateral power, to the extent permitted by law, to fix from time to time the premiums to be paid by Payroll.

The opinion and judgment of the district court are affirmed in part and reversed in part and the case is remanded to the district court with directions to enter a judgment in accordance with the foregoing. Costs are awarded to Payroll.