PARKER, Circuit Judge:
John S. Pereira, Esq., acting as the Chapter 11 Trustee of the Estate of Payroll Express Corporation appeals from a final judgment of the United States District Court for the Southern District of New York (Shira A. Scheindlin, Judge) entered February 25, 1998 implementing an opinion and order dated August 6, 1997 granting summary judgment for Federal Insurance Company (“Federal”), and another opinion and order dated October 1, 1997 granting summary judgement for the London Excess Underwriters (“LEU”), and partial summary judgement for the Aetna Casualty & Surety Company (“Aetna”).
I. BACKGROUND
A. Facts
Payroll Express Corporation is a New Jersey corporation (“PEC-NJ”) which maintained its principal place of business in New Jersey during its period of operations, from the late 1960s to May 1992. Payroll Express Corporation of New York (“PEC-NY”) is a related corporation whose principal place of business was New York. The companies (collectively “PEC” or “Payroll Express”) provided payroll check cashing and cash distribution services in New Jersey and New York. Customers included nursing homes, hospitals, New York University, the New York City Transit Authority, and the Payroll Administration of the City of New York, among many others.
On a biweekly or monthly basis PEC’s customers wire-transferred millions of dollars into PEC’s bank accounts. Subsequently, PEC would arrive at the customer’s place of business on its payday and provide teller services to its employees, such as exchanging cash for an employee’s endorsed paycheck. Payroll Express would then return the cashed paychecks to the customer along with any unused portion of the money initially deposited into its account by the customer.[1]
Not surprisingly, PEC’s customers required PEC to maintain full insurance coverage to safeguard their money while it was being held by PEC. Payroll Express thus obtained insurance to cover theft, including employee theft, from each of the defendant insurance companies, with Marshall & Sterling of Poughkeepsie, New York (“M & S”) acting as an insurance broker.
*200 From 1987 through May 1992, Robert Felzenberg — founder, president, CEO and half-owner of PEC and his wife Barbara Felzenberg — the Secretary and other half-owner of PEC — diverted PEC funds for their own benefit. They used the money to fund at least four other companies in their control, to acquire various personal items, and to cover PEC’s cash flow needs. Other PEC employees also engaged in these activities including PEC’s comptroller George Gillmore, Howard Messer, Robert Gussow (B. Felzenberg’s father), and Rose Felzenberg (Robert Felzenberg’s mother).
Until about July 1991, funds were diverted by simply failing to return unused monies to customers in a timely manner. After July 1991, the defalcating employees turned to another strategy. They engaged in a check-kiting scheme whereby they simultaneously inflated PEC account balances in two banks by continually depositing worthless checks of small amounts in each PEC bank account, drawn on the PEC account from the other bank. This fraudulent activity was discovered in May 1992. As of June 5, 1992, PEC had liabilities of approximately $36.2 million and assets of only about $3 million.
On July 13, 1993, Robert Felzenberg pleaded guilty to a federal Criminal Information charging him with felonies relating to the fraud at PEC. See United States v. Felzenberg, No. 93 CR. 460(SS), 1998 WL 152569 (S.D.N.Y. Apr. 2, 1998)(ruling on Robert Felzenberg’s section 2255 petition, describing the background of the criminal case). Felzenberg admitted to diverting millions of dollars from PEC over the years. He was sentenced to 78 months’ imprisonment and ordered to pay $36 million in restitution. Gillmore also pleaded guilty in a related proceeding and was sentenced to five years’ probation and restitution of $20,000.
On June 5, 1992, PEC-NJ and PEC-NY filed their respective Chapter 11 petitions with the United States Bankruptcy Court for the Southern District of New York. In re Payroll Express Corp., Chapter 11 Case No. 92-B-43150. On June 8, 1992, the Bankruptcy Court authorized the joint administration of both cases and on June 26, 1992, John S. Pereira, Esq. was appointed as Trustee of PEC.
In June 1993, the Trustee submitted a Proof of Loss prepared by Price Water-house, L.L.P. to LEU, Aetna, and Federal, seeking to recover a total of $33,666,080 under the policies for funds lost due to the fraudulent conduct of the Felzenbergs and other PEC employees. The Trustee submitted a supplemental proof of loss statement in July 1994. The insurance companies each denied the Trustee’s claim against its respective policy or policies.
1. The Aetna Policy
On or about February 19, 1976, Aetna issued to PEC-NJ a Comprehensive Dishonesty, Disappearance, and Destruction Policy (the “Aetna Policy”). The policy was amended to make it noncancellable unless PEC failed to pay the premiums. Aetna attempted to cancel the policy on May 2, 1980. PEC brought an action in federal district court for an injunction preventing Aetna from canceling the policy. The district court ordered the relief sought and this Court affirmed. See Payroll Express Corp. v. Aetna Cas. & Sur. Co., 659 F.2d 285 (2d Cir.1981). PEC-NY was added to the policy effective June 22, 1988.
The Preamble and Insuring Agreement I of the Aetna Policy provide in pertinent part: “The Company ... agrees with the Insured ... to pay the Insured for: ... Loss of Money, Securities, and other property which the Insured shall sustain ... through any fraudulent or dishonest act or acts committed by any of the Employees, acting alone or in collusion with others.” Section 3 of the Conditions and Limitations portion of the Aetna Policy defines “employee” as:
any natural person (except a director or trustee of the Insured, if a corporation, who is not also an officer or employee *201 thereof in some other capacity) while in the regular service of the Insured in the ordinary course of the Insured’s business during the Policy Period and whom the Insured compensates by salary, wages or commissions and has the right to govern and direct in the performance of such service.
Endorsement 28 of the Aetna Policy excludes PEC’s President Robert Felzen-berg from this definition of employee. Section 2(a) of the Exclusions segment of the Aetna Policy states that the policy does not apply “to loss due to any fraudulent, dishonest or criminal act by any Insured or a partner therein, whether acting alone or in collusion with others.”
2. The LEU Policies
LEU issued three policies to PEC effective February 7, 1992 for a twelve month period: (1) London Primary Layer Policy; (2) First LEU Excess Policy; and (3) Second LEU Excess Policy (collectively, the “LEU Policies”). The Primary Layer Policy and the First LEU Excess Policy provided coverage for “Employee Theft, Premises Loss and Transit Loss.” The Second LEU Excess Policy provided for “Employee Theft” occurring at PEC’s NJ and N.Y. offices; and “Premises Coverage” at those same two locations. The application form for these policies was submitted through M & S on January 16, 1992, and signed by Robert Felzenberg as PEC’s president.
Question 10 of the LEU application asked, “[h]as the proposer suffered a loss during the past five years? If “Yes” give brief details and amount involved.” Fel-zenberg replied, “YES, SECURITY SYSTEM FOR PREMISES & VAULT WAS BREACHED DURING NON OPERATING HOURS. BURGLARY AMOUNT WAS $1,500,000. OCCURRED ON 5/19/88 AT OUR [NY office] LOCATION.”
Question 36 inquired, “[i]s there any other information which is or may become material to the proposed insurance and which is not already disclosed to underwriters?” The response was “NONE.” Above the line on which Robert Felzen-berg signed his name was written the following:
I/WE HEREBY DECLARE THAT THE ABOVE STATEMENTS, PARTICULARS AND ANSWERS ARE TRUE AND THAT I/WE HAVE NOT SUPPRESSED OR MISSTATED ANY MATERIAL FACTS....
IT IS FURTHER AGREED THAT THE CONTINUED ACCURACY OF THE STATEMENTS, PARTICULARS AND ANSWERS SHALL BE A CONDITION PRECEDENT TO UNDERWRITERS’ LIABILITY UNDER THE PROPOSED INSURANCE.
Also pertinent to this appeal, the LEU Primary Policy provided that:
Employee or Employees means, respectively, one or more persons while in the regular service of any Insured in the ordinary course of the Insured’s business ... whom any Insured compensates by salary, wages and/or commissions and has the right to govern and direct in the performance of such service;. and shall also mean;
(A) Any non-compensated officer of any Insured....
(C) Any director or trustee of any Insured while performing acts coming within the scope of the usual duties of an Employee.
3. The Federal Policy
Effective February 7, 1986, PEC purchased a Crime Insurance Policy (the “Federal Policy”) from Federal, which is a member of the Chubb Group of Insurance Companies. Section 2. Exclusions of the Federal Policy provides that coverage “does not apply to: (H) loss unless reported and proved in accordance with Section 4.5 hereof; (I) loss unless discovered and written notice given to [Federal] within (1) sixty days following termination of this policy in its entirety.” Section 4.5 provides in pertinent part: “[u]pon knowledge *202 or discovery ... of loss ... written notice shall be given at the earliest practicable moment, and in no event later than sixty days after such discovery.” Section 4.8 of the Federal Policy further provides that,
[a]t any time prior to the termination of this policy in its entirety ... the Insured may give written notice to [Federal] that it desires an extension of the period for discovery of loss under this policy from sixty days to one year and shall pay an additional premium for such extension.
Section 6.2 of the Federal Policy specifies that termination is effective “(A) thirty days after the receipt by the Insured of a written notice of termination from the Company” or “(B) upon the receipt by the Company of a written notice of termination from the Insured.” However, Endorsements No. 5 and 33 to the Federal Policy prohibit either party from canceling without first giving notice to two of PEC’s customers:
no change in or cancellation of this bond, whether by or at the request of the Insured or by the Company shall take effect prior to the expiration of forty five (45) days after notice by registered mail of such change or cancellation of this bond has been received by the office[s] of the Department of Finance of the City of New York [and] ... the New York City Transit Authority.
By letter dated December 6, 1988, PEC notified M & S of its intention to “non-renew” the Federal Policy, effective February 7, 1989. Marshall & Sterling forwarded that letter to Federal by fax. On February 10, 1989, Robert Felzenberg signed a “Cancellation Notice” prepared by Federal effective February 7,1989. No premiums were paid by PEC to Federal after that date. Payroll Express obtained substitute coverage from LEU for the loss payees of the Federal Policy from the date of its cancellation of the Federal Policy. It is disputed whether PEC or Federal ever notified the Department of Finance of the City of New York or the New York City Transit Authority of the cancellation.
B. Proceedings Below
On May 1, 1995, the Trustee commenced an adversary proceeding in the United States Bankruptcy Court for the Southern District of New York against Aetna, Federal, and LEU. The Trustee sued to enforce the terms of the various employee dishonesty insurance policies issued to PEC and to recover damages for the defendants’ alleged bad faith denial of coverage under the policies. The Trustee sought recovery under these insurance policies for losses caused by the dishonest and fraudulent acts of certain former employees at PEC in an amount in excess of $3 million. Defendants moved for a withdrawal of the reference of the adversary proceeding from the Bankruptcy court. On August 16, 1995, the district court granted the Defendants’ motions and withdrew the reference of the Trustee’s claims from the Bankruptcy Court as a non-core proceeding.
On December 1, 1995, the district court ruled from the bench that New Jersey law applies to the Trustee’s claims of bad faith denial of coverage. On January 23, 1996, the district court granted Aetna’s motion to dismiss the Trustee’s bad faith claim pursuant to Fed.R.Civ.P. 12(b)(6), but denied LEU’s motion to dismiss the Trustee’s bad faith claim. See Pereira v. Aetna Cas. & Sur. Co. (In re Payroll Express Corp.), No. 95 CIV. 4385, 1996 WL 22960 (S.D.N.Y. Jan. 23, 1996). Subsequently, in an opinion and order dated April 3, 1996, the district court denied LEU’s motion for reargument of the December 1, 1995 choice of law ruling and LEU’s motion to certify this question for appeal. See Pereira v. Aetna Cas. & Sur. Co. et al. (In re Payroll Express Corp.), 921 F.Supp. 1121 (S.D.N.Y.1996).
In an opinion and order dated August 6, 1997, the district court granted Federal’s summary judgment motion pursuant to Fed.R.Civ.P. 56. See Pereira v. Aetna Cas. & Sur. Co. et al. (In re Payroll *203 Express Corp.), 216 B.R. 498 (S.D.N.Y.1997), reconsid. denied, No. 95 CIV. 4385, 1997 WL 539777 (S.D.N.Y. Aug. 28, 1997). Originally, the Trustee asserted in its complaint that the cancellation of the Federal Policy was ineffective because PEC had failed to comply with the notice requirements in Endorsements 5 and 33 to that policy. However, in response to Federal’s summary judgment motion, the Trustee limited its claims against Federal to losses occurring before February 7, 1989, when PEC canceled its policy. See Pereira, 216 B.R. at 501.
The Trustee contended that the notice of loss to Federal was timely because Federal’s failure to provide proper notice to the New York City Transit Authority and Finance Department effectively extended the time PEC had to notify Federal of a loss as to those two loss payees, even if it did not negate PEC’s cancellation of the policy. Therefore, since the trustee filed for losses within sixty days of the trustee’s discovery of the loss, timely notice of loss was provided as to losses suffered by the New York City Transit Authority and New York City Finance Department as required by Section 4.5 of the Federal Policy. Id. The district court rejected all of the Trustee’s arguments because: (1) no premiums had been paid to Federal since 1989 as required under Section 4.8 to extend coverage to later discoveries; (2) the policy had no language that it was self-renewing upon ineffective notice of cancellation provided for in Endorsements 5 and 33; and (3) the purpose of the notice of cancellation is to protect the Insured from being left without coverage, which was not offended when the Insured canceled and then obtained substitute coverage for the loss payees who were to be notified of such cancellation. Id. at 501-02.
In a 51-page opinion and order dated October 1, 1997, the district court granted the summary judgment motion of LEU and partially granted the summary judgement motion of Aetna pursuant to Rule 56, giving a thorough treatment of the facts and issues in the case. See Pereira v. Aetna Cas. & Sur. Co. (In re Payroll Express Corp.), 216 B.R. 344 (S.D.N.Y.1997), reconsid. denied, 216 B.R. 713 (S.D.N.Y.1997).
As a threshold matter, the district court decided that under New York choice-of-law rules, New Jersey law should apply to the Trustee’s contract claims. The district court noted that under the New York choice-of-law test “it is difficult indeed to determine whether New York or New Jersey has a greater interest in this dispute.” Pereira, 216 B.R. at 354. However, the district court decided that because it had earlier applied New Jersey law to the bad faith claims, “[pjragmatic considerations” and “the law of the case doctrine strongly militate! ] in favor of concluding that New Jersey law must apply to [the Trustee’s] breach of contract claims.” Id. at 355.
In considering LEU’s motion for summary judgment, the district court first found that Felzenberg’s response to Question 10 on the LEU application was false because PEC had in fact suffered losses eighteen times during the previous five years, rather than once as indicated by Felzenberg. Id. The court rejected the Trustee’s arguments that there were issues of material fact as to: (1) whether LEU had actual or constructive knowledge of the other robberies, and (2) whether the undisclosed losses were immaterial to the application because of their size. Further, the district court rejected the Trustee’s argument that Question 10 is ambiguous. Accordingly, the district court found Fel-zenberg’s response to Question 10 to be a material misrepresentation voiding the LEU Policies ab initio. Id. at 355-59.
The district court also found as an alternative ground for voiding the LEU policies, that Robert Felzenberg’s response to Question 36 of the LEU application was a material misrepresentation because Fel-zenberg failed to disclose his defalcations. The district court rejected the Trustee’s arguments that the question was over-broad and ambiguous and that Felzen- *204 berg’s response cannot be imputed to PEC under the doctrine of “adverse domination.” Pereira, 216 B.R. at 359-60. Because the court found the LEU policies void, it did not reach the issue raised by the Trustee’s cross-motion for summary judgment of whether Robert Felzenberg was a covered “employee” under the LEU policies.
As to Aetna’s motion for summary judgment, the district court rejected Aetna’s theory that Robert and Barbara Felzen-berg were merely the equitable “alter egos” of PEC, and therefore, refused to credit Aetna’s argument that since the fraud was committed by the Insured itself, coverage was properly denied pursuant to Endorsement 2 of the Aetna Policy. Id. at 360-61. Instead, the court granted Aet-na’s motion on the grounds that the Fel-zenbergs were contractual alter egos of PEC. The district court reasoned that because the two Felzenbergs dominated and controlled PEC, neither could be considered an “employee” whose theft would be covered under the Aetna Policy. Id. at 361-63.
Regarding other PEC employees, the district court found that there was an issue of material fact as to whether Gillmore, Rose Felzenberg, Robert Gussow, and Howard Messer “independently caused losses to PEC through dishonest conduct” which would be covered by the! Aetna Policy. Id. at 363-64. However, the district court found “no probative evidence to suggest that any PEC losses were ‘due to’ the dishonest conduct of Alicia or Emily Fel-zenberg.” Id. at 364.
Finally, the district court decided the Trustee’s bad faith denial of coverage claim remaining against LEU. Citing Pickett v. Lloyd’s, 131 N.J. 457, 621 A.2d 445, 453-54 (1993), the district court noted that under the “fairly debatable” standard a claimant who was not entitled to summary judgment on the substantive claim could not prevail against the insurer for bad faith refusal to pay the claim. Because the Trustee failed on summary judgment to support his claim that the debtor was entitled to recovery under the LEU policies, the Trustee had no valid bad faith denial of coverage claim against LEU. Pereira, 216 B.R. at 365.
On December 1, 1997, Aetna and the Trustee stipulated to dismiss without prejudice all the remaining claims against Aet-na. On December 10, 1997, the district court entered judgment dismissing the Trustee’s Conformed Amended Complaint based on the court’s earlier orders granting summary judgment and the stipulation of dismissal. In an Amended Stipulation of Voluntary Dismissal dated February 24, 1998, the Trustee and Aetna agreed “to dismiss with prejudice all those claims against Aetna remaining to be tried pursuant to [the district court’s] October 1, 1997 Opinion and Order.” On February 25, 1998, the district court endorsed an Amended Final Judgment dismissing the Conformed Amended Complaint of the Trustee based on the orders granting summary judgment and the Amended Stipulation of Voluntary Dismissal. The Trustee filed a timely notice of appeal.
II. DISCUSSION
On appeal, the Trustee argues primarily that the district court failed to consistently preserve the corporate form of PEC. Namely, he asserts that the court erroneously disregarded the corporate form of PEC by imputing to the corporation the wrongdoing .of its president, Robert Fel-zenberg. The Trustee also contends that genuine issues of material fact exist to preclude summary judgment, that the district court erred in finding that the Trustee could not prove a claim of bad faith failure to investigate, that the court should not have assumed cancellation of the Federal Policy, and that the Trustee should not have to show that losses caused by non-principal employees were independently caused.
Reviewing the district court’s grant of summary judgement de novo, Young v. *205 County of Fulton, 160 F.3d 899, 902 (2d Cir.1998), we affirm for substantially the same reasons stated in the district court’s thorough and well-reasoned opinions.[2] See Pereira, 216 B.R. at 498 (granting summary judgment to Federal); Pereira, 216 B.R. at 344 (granting summary judgment to LEU and partial summary judgment to Aetna). We write only to address the Trustee’s contention that it was inconsistent for the district court to hold, on one hand, that Robert Felzenberg was not the alter ego of PEC, and, on the other hand, that the material misrepresentations made by Robert Felzenberg on the LEU application can be imputed to PEC to void the LEU Policies ab initio. In analyzing this question we follow New Jersey law, since the Trustee does not dispute the district court’s determination that New Jersey law applies to the issues in this case. See Hannex Corp. v. GMI, Inc., 140 F.3d 194, 203 n. 7 (2d Cir.1998).
In its motion for summary judgment, Aetna argued that the Felzenbergs were equitable alter egos of PEC and therefore the corporate form should be disregarded. Pereira, 216 B.R. at 360. The district court disagreed with Aetna. The court explained that New Jersey law favors upholding the separate identity of a corporation, even when the corporation is owned by one or two shareholders or family members. Id. at 360-61 (citing Coppa v. Taxation Div. Dir., 8 N.J.Tax 236, 245 (1986)). Because Aetna failed to establish that the Felzenbergs’ “disregard of the corporate entity” transformed PEC into “a mere instrumentality for the transaction of their own affairs,” the district court declined to hold that Robert and Barbara Felzenberg were the alter egos of PEC. Id. at 361 (quoting Coppa, 8 N.J.Tax at 245).
The Trustee agrees with this holding, but says it is inconsistent with the court’s treatment of the corporate form when considering the effect of Robert Felzenberg’s misrepresentations on the application form for the LEU policies. As noted above, the district court found that Robert Felzen-berg made material misrepresentations in answering two questions on the LEU application form for which PEC was responsible, each of which served to void the policies ab initio. Pereira, 216 B.R. at 355. The Trustee offers two rationales for why Robert Felzenberg’s misrepresentations should not be imputed to PEC. He first argues that the district court should have applied the doctrine of adverse domination to bar the imputation. Second, he contends that the adverse interest exception to general agency principles compels the conclusion that the debtor corporation should not be barred by Robert Felzen-berg’s misrepresentations from enforcing the terms of the LEU policies.
A. Adverse Domination Doctrine
Adverse domination is an equitable doctrine which operates to toll the statute of limitations for a corporation’s claims against its officers or directors when the persons in charge of the corporation cannot be expected to pursue claims adverse to their own interests. Republic of the Philippines v. Westinghouse Elec. Corp., 714 F.Supp. 1362, 1371 n. 3 (D.N.J.1989). The adverse domination theory initially gained prominence in failed bank and thrift litigation. See generally Matthew G. Dore, Statutes of Limitation and Corporate Fiduciary Claims: A Search for Middle Ground on the Rules/Standards Continuum, 63 Brook. L.Rev. 695, 713-14 (1997). At the same time, the FDIC began to argue with limited success that the doctrine should serve to toll notice provisions relating to discovery of loss in insurance policies that covered failed financial institutions. See, e.g., FDIC v. Oldenburg, *206 34 F.3d 1529, 1544 (10th Cir.1994)(citing cases); California Union Ins. Co. v. American Diversified Sav. Bank, 948 F.2d 556, 565 (9th Cir.1991)(recognizing the validity of the doctrine, but holding no equitable tolling on the facts presented).
In making his argument, the Trustee relies heavily on Shields v. National Union Fire Ins. Co. (In re Lloyd Securities, Inc.), 153 B.R. 677 (E.D.Pa.1993). In that case the Trustee brought suit against the debtor’s insurance company trying to enforce a fidelity bond. The two corporate officers of the debtor had been misappropriating funds belonging to the debtor’s customers at the time the debtor applied for the fidelity bonds. The officers made fraudulent misrepresentations on the bond application. Id. at 680. The district court in Lloyd Securities agreed with the bankruptcy court that the theory of adverse domination applied to toll the date of discovery under the terms of the bond until the debtor was put on notice by a third party of the officers’ wrongdoing. As a result, the district court found that the officers’ conduct could not be imputed to the debtor to rescind the bond because the corporation had knowledge of its employees’ dishonesty, but failed to give the insurance company timely notice. Id. at 685. Without discussion, the court also held that the theory of adverse domination prevented the insurance company from terminating the bond due to the misrepresentations on the application. Id.
For several reasons we disagree with the Trustee’s contention that the district court erred by declining to apply the adverse domination doctrine in the present case. We first note that New Jersey has not adopted the adverse domination theory. See Levitt v. Riddell Sports, Inc. (In re MacGregor Sporting Goods, Inc.), 199 B.R. 502, 515 (Bankr.D.N.J.1995)(noting absence of decisions of New Jersey courts expressly adopting adverse domination theory). Fortunately, it is unnecessary for us to predict whether the New Jersey Supreme Court would choose to do so, since the adverse domination theory does not apply under the present circumstances in any event.
Adverse domination is a tolling doctrine. It was originally developed to toll the statutes of limitations applicable to a corporation’s claims against its officers and directors. In the fidelity insurance context, it has been applied to toll the time a corporation has to notify its insurer of employee theft. In both contexts in which the doctrine has been applied it is based on the recognition that since a defalcating officer or director cannot be expected to protect the interests of the corporation, knowledge of the theft should not be imputed to the corporation for the purpose of tolling an otherwise applicable time limitation on bringing a claim. See Resolution Trust Corp. v. Gardner, 798 F.Supp. 790, 795 (D.D.C.1992)(discussing the rationale underlying the doctrine).
The Trustee appears to argue that the same rationale should apply to misrepresentations made on an insurance application by a defalcating employee. The difficulty with the Trustee’s attempt to apply the adverse domination theory to the LEU policies is that no otherwise applicable time period, and therefore no tolling is implicated by the district court’s decision. The district court held that the LEU policies were void ab initio because Robert Felzneberg made material misrepresentations on the application. That holding has nothing to do with the timing of the corporation’s discovery of the wrongdoings for notice purposes.
To the extent that the court in Lloyd Securities based its determination that the material misrepresentations on the fidelity bond application should not be imputed to the debtor corporation on the adverse domination doctrine, the decision was, at best, an extension of the doctrine well beyond its equitable tolling roots. Whereas the equitable tolling of statutes of limitations and other time periods only exposes an insurer to losses of a sort the insurer has already agreed to absorb, ex *207 tending this doctrine to the concealment of fraud in a policy application exposes the insurer to risks the insurer otherwise would not have assumed. We decline to extend the doctrine in such a manner, particularly in the absence of any indication that the New Jersey Supreme Court would recognize even a traditional version of the theory. Cf. Trans World Metals, Inc. v. Southwire Co., 769 F.2d 902, 908 (2d Cir.1985)(declining to extend the application of a state statute where the New York courts had not adopted the urged interpretation).
B. Adverse Interest Exception
The Trustee also invokes the adverse interest exception to general agency principles to justify why the debtor corporation should not be barred from enforcing the terms of the LEU policies despite Felzenberg’s misrepresentations. The general rule is that a representation made by an authorized agent of the principal is binding upon the principal. Carlson v. Hannah, 6 N.J. 202, 78 A.2d 83, 88 (1951); Tannenbaum & Milask, Inc. v. Mazzola, 309 N.J.Super. 88, 706 A.2d 780, 783 (1998); see also 7 Couch on Insurance § 100:9 (Lee R. Russ et al. eds., 3d ed., 1995-96)(explicating the same general rule in the insurance context). There is an exception to this rule when the agent is acting completely adversely to the interests of the principal. National Union Fire Ins. Co. v. Bonnanzio (In re Bonnanzio), 91 F.3d 296, 303 (2d Cir.1996); see also Restatement (Second) of Agency § 282 (1958).
The New Jersey Supreme Court has yet to ascertain the operation and scope of the adverse interest doctrine, but we think it is clear that under New Jersey law, principles of agency operate to hold PEC responsible for the consequences of Felzenberg’s misrepresentations. A corporation, possessing an identity only in a legal sense, necessarily speaks through its agents. In an action for contract rescission, an agent’s misrepresentations bind the principal if the agent was authorized to represent the principal in obtaining the contract. Equitable Life Assurance Soc’y v. New Horizons, Inc., 28 N.J. 307, 146 A.2d 466, 470 (1958); see also Parker Precision Prods. Co. v. Metropolitan Life Ins. Co., 407 F.2d 1070, 1073 (3d Cir.1969)(applying New Jersey law to find the corporate principal responsible for the material misrepresentations of the corporation’s president on an application for life insurance).
In Equitable Life the general manager of Linden Tool made misrepresentations as to his medical condition on an application for life insurance his employer wanted to take out on him as an essential employee. 146 A.2d at 467-68. The New Jersey Supreme Court held that Linden Tool was responsible for the misrepresentations because the general manager was acting as an agent on behalf of the corporate principal in procuring the policy. Id. at 470. Crucially, in so holding, the Court did not impute the agent’s knowledge of his health status to the principal. In fact, the Court explained that the principal’s ignorance of the misrepresentations was irrelevant, because “[i]nnocent material[3] misrepresentations will, in equity, support rescission of an insurance contract.” Id.
Thus, the Trustee’s argument that the district court improperly disregarded PEC’s corporate form to impute Felzenberg’s fraud to PEC, mischaracterizes the holding. The district court’s conclusion that PEC is responsible for the misrepre *208 sentations of its agent did not require disregarding the corporate form.[4] The result does not turn on a determination that Fel-zenberg’s fraud is PEC’s fraud, or that Felzenberg’s knowledge is PEC’s knowledge. Rather PEC, as the corporate principal, is held responsible for the false statements made by an agent it authorized to conduct business on its behalf. This holding is entirely consistent with New Jersey law as explicated in Equitable Life.
The Trustee attempts to distinguish Equitable Life, arguing that the agent in that case was acting to benefit the corporation by procuring the life insurance policy, whereas Robert Felzenberg was acting adversely to PEC’s interests and in his own behalf. Given the holding in Equitable Life, the Trustee must necessarily be arguing that even material misrepresentations will not serve to rescind an insurance policy when the Insured’s agent was acting adversely to the interests of the Insured. Arguably, Felzenberg was acting on behalf of PEC in procuring the LEU policies, not adversely to it. See Gordon v. Continental Cas. Co., 319 Pa. 555, 181 A. 574, 576 (1935)(imputing to the corporation the failure of its officer to disclose his defalcations on a fidelity bond application because the officer was not acting adversely to the corporation in procuring the bond); see generally In re Maxwell Newspapers, Inc., 151 B.R. 63, 69 (Bankr.S.D.N.Y.1993)(hold-ing under New York law that the adverse interest exception is not applicable when an agent acts for both himself and his principal, even where the agent’s interests are primarily inimical to those of the principal); Restatement (Second) of Agency § 282 cmt. c (1958)(“[t]he mere fact that the agent’s primary interests are not coincident with those of the principal does not prevent the latter from being affected by the knowledge of the agent if the agent is acting for the principal’s interests”). However, we need not decide this question because there is a more fundamental flaw in the Trustee’s attempt to invoke the adverse interest doctrine.
A principal may not disavow an act of an agent while simultaneously taking advantage of the benefits of the fraudulently procured bargain. See Restatement (Second) of Agency § 282 cmt. h (1958)(a principal may not disclaim knowledge of the agent’s fraud and yet attempt to retain a benefit obtained by the fraud; this is a restitution principle preventing the unjust enrichment of the principal). In other words, the adverse interest exception acts as a shield for a principal, so that the adverse acts of its agent cannot be imputed to the principal to hold it liable for the misdeeds of the agent. A principal may not use the doctrine as a sword to force a third party defrauded by its agent to abide by the terms of the agreement. Cf. Munroe v. Harriman, 85 F.2d 493, 495 (2d Cir.1936)(when a principal chooses to disclaim the act of an agent as unauthorized it may not seek to retain the benefit gained from the act; a principal who retains a benefit fraudulently obtained bears the burden of the agent’s knowledge); Restatement (Second) of Agency § 282 cmt. 1 (1958)(where a party transfers property to another party due to the fraud of the second party’s agent, the first party is entitled to recission).
It is not possible, as the Trustee’s argument suggests, to excise the fraudulent statement from the transaction and retain the benefit of the remainder. Indeed, in the present case, a representative of LEU testified that the company would never have issued the policies had it known of the defalcations of the Felzenbergs and *209 other PEC employees. There would thus have been no contract absent the false answer to Question 36. Although such an all-or-nothing rule may seem unfair to an innocent principal, it would be even less fair to enforce an agreement against an innocent third-party that it would never have entered but for the misrepresentations made by the other party’s agent.
Some courts have permitted an Insured to assert the adverse interest exception to recover under an insurance policy obtained by a defalcating employee on the Insured’s behalf, holding that the agent’s knowledge of his misdeeds could not be imputed to the Insured. See, e.g., Puget Sound Nat’l Bank v. St Paul Fire & Marine Ins. Co., 32 Wash.App. 32, 645 P.2d 1122, 1126-28 (1982). However, these cases do not explain why the restitution principle of unjust enrichment does not act as a bar to recovery. New Jersey’s courts have not addressed this question; however, our approach is consistent with the rationale given for the holding in Equitable Life. There, the New Jersey Supreme Court acknowledged that both the Insurer and the Insured were innocent parties, but found that they were not in the same position vis-a-vis the Insured’s agent. As between the innocent Insured and the innocent Insurer, the former should shoulder the burden created by any falsehoods made by the agent which it chose to represent it in the transaction. Equitable Life, supra, at 469 (an insurance contract is one of the “utmost good faith,” with the Insurer relying on the truthfulness of the Insured’s statements).
In contrast, the position argued by the Trustee would cause the Insurer to bear the risk that a corporation’s agent will lie on a policy application to hide his own defalcations. The case cited by the Trustee to support this contention is inapposite to the present circumstances. In Phoenix Sav. & Loan, Inc. v. Aetna Cas. & Sur. Co., 427 F.2d 862, 870-71 (4th Cir.1970), the Court did find that Aetna had implicitly recognized the unreasonableness of expecting a wrongdoer to be completely candid when applying for fidelity insurance on behalf of his employer. However, in that case, unlike here, the insurance policy itself included a clause stating that concealment by the signer of the application was not imputable to the Insured. Id. The Trustee fails to explain why in the absence of such a clause, the risk should be placed on the Insurer, rather than the Insured which chose the agent to represent it in the transaction.
Nor do we find persuasive the Trustee’s alternative argument that even if a corporate principal may not use the adverse interest exception to benefit from a contract fraudulently obtained by the corporation’s agent, the corporation’s creditors may. The Trustee contends that in this case the debtor corporation will not benefit from any monies recovered under the insurance policies. Instead, any funds paid out by the Insurer will go only to PEC’s creditors, many of whom as customers of PEC were loss payees under the LEU policies. Despite the general rule that a Trustee is subject to the same defenses in a legal action as the debtor would be, Bank of Marin v. England, 385 U.S. 99, 101, 87 S.Ct. 274, 17 L.Ed.2d 197 (1966), at least one court[5] has held that a Trustee may invoke the adverse interest exception to enforce an insurance policy *210 for employee theft, as the debtor corporation’s creditors will receive the benefit, not the corporation itself. See Shields v. National Union Fire Ins. Co. (In re Lloyd Securities, Inc.), Proceeding No. 90-0985S, 1992 WL 236162, at *10-12 (Bankr.E.D.Pa. Sept. 17, 1992).
However sound this result may be for a court applying Pennsylvania law, the Trustee cannot obtain it from a court implementing the law of New Jersey. Under New Jersey law, if the Insured cannot recover under an insurance policy, the Insured’s creditors cannot recover. Liberty Mut. Fire Ins. v. Kahlaid, Inc., 199 N.J.Super. 494, 489 A.2d 1231, 1232 (1985)(secured creditor had no right as a mere loss payee to recover under a casualty policy under which the Insured could not recover because it breached a policy provision). It thus follows from our holding that PEC could not recover under the LEU policies, that PEC’s creditors could not recover either.[6]
Because we agree with the district court’s alternate holding that the LEU policies were void ab initio due to Robert Felzenberg’s materially false answer to Question 36, we need not reach the Trustee’s argument that the district court erred in holding that Felzenberg’s misrepresentation as to Question 10 was material as a matter of law. We have considered all of the other arguments advanced by the Trustee on appeal and find them to be without merit.
III. CONCLUSION
The district court correctly declined to disregard PEC’s corporate form, finding that the Felzenbergs were not alter egos of PEC. This finding was not inconsistent with holding PEC responsible for material misrepresentations made by Robert Fel-zenberg on the LEU application. Robert Felzenberg acted on behalf of PEC as the corporation’s agent in procuring the LEU policies. Under New Jersey law the corporate principal is responsible for the consequences of its agent’s material misrepresentations on an insurance application, even when the principal could have no knowledge of the agent’s deceptions. Neither the adverse domination theory nor the adverse interest exception serve to negate the consequences for PEC of Robert Felzenberg’s misrepresentations. Accordingly, the LEU policies were void ab initio. The judgment of the district court is AFFIRMED.

. For a more detailed description of PEC's business, see Payroll Express Corp. v. Aetna Cas. & Sur. Co., 659 F.2d 285, 287 (2d Cir.1981).

. We do not, however, consider the Trustee’s arguments on appeal pertaining to the fraudulent conduct of Gilmore, Gussow, Messer, and Rose Felzenberg since the Trustee entered into an Amended Stipulation of Voluntary Dismissal dated February 24, 1998 in which he agreed to dismiss with prejudice the claims remaining against Aetna pursuant to the district court’s Opinion and Order dated October 1, 1997.

. Under New Jersey law, a misrepresentation is material if it is "reasonably related to the estimation of the risk or the assessment of the premium." Massachusetts Mut. Life Ins. Co. v. Manzo, 122 N.J. 104, 584 A.2d 190, 196 (1991). There can be no doubt that Robert Felzenberg's failure to inform LEU, in response to Question 36, that certain employees were embezzling funds from PEC was material as a matter of law. A jury could not reasonably find that the omission is not related to LEU’s assessment of the risk involved in covering PEC for employee theft.

. Although the district court did state that it rejected "plaintiffs attempt to interpose PEC’s corporate form to avoid the consequences of Robert Felzenberg’s material misrepresentations,” Pereira, 216 B.R. at 360, this language merely explains why the court was unpersuaded by the Trustee's adverse domination theory. In any event, this Court may affirm the holding of the district court on any ground appearing in the record, even if not relied upon by the district court. Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 63-64 (2d Cir.1997).

. The Trustee also cites Gordon, 181 A. at 576, arguing that the Pennsylvania Supreme Court set forth "an important exception to the adverse interest rule,” Brief for Appellant at 28-29, namely that a corporate principal cannot use the adverse interest exception to enforce the benefit of a fraud perpetrated by its agent. Presumably the Trustee is arguing that even though the Gordon court found against the corporate principal it would have held for the corporation’s creditors because the corporation would not benefit from its agent's fraud if the creditors were permitted to recover. The Trustee's reliance on Gordon is misplaced; the question posed by the Trustee was not before the court. Moreover, the language relied on by the Trustee does not articulate an exception to the adverse interest exception. The court was merely explaining why it was persuaded by the Insurer's argument that the restitution principle preventing unjust enrichment should bar the corpora- *210 lion's recovery under the fidelity bond. Indeed, to the extent the holding in Gordon was based on this principle we concur with the court’s reasoning.

. To the extent the Trustee is contending that the right of PEC’s creditors to recover under the LEU policies should be analyzed independently from PEC's right to recover, we disagree. A trustee may bring only those claims that a debtor could have brought prior to entering bankruptcy. Hirsch v. Arthur Andersen & Co., 72 F.3d 1085, 1093 (2d Cir.1995). Although this set of claims may include some founded on the rights of a debtor's creditors, whether such a claim can be brought by a debtor's trustee or belongs exclusively to the individual creditors is determined by state law. Id. The Trustee in the present case has not addressed the issue of whether he has standing to raise any claims on behalf of PEC's creditors. We, therefore, could not consider the argument made by the Trustee for the creditors as anything but derivative of the debtor’s rights.